Thomas **KAPATOS**, Petitioner-Appellant,

v.

**UNITED STATES of America,**
**Respondent-Appellee.**

**No. 18, Docket 34638.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 14, 1970.

Decided Oct. 6, 1970.

———◆———

Patrick M. Wall, New York City (Theodore Rosenberg, Brooklyn, N. Y., of counsel), for petitioner-appellant.

John M. Walker, Jr., Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., for the Southern District of New York, and Peter L. Truebner, Asst. U. S. Atty., of counsel), for respondent-appellee.

Before FRIENDLY, SMITH and HAYS, Circuit Judges.

FRIENDLY, Circuit Judge:

This is an appeal from an order of the District Court for the Southern District of New York denying, without an evidentiary hearing, Kapatos' third petition under 28 U.S.C. § 2255 [1] to vacate his conviction, after trial before Judge Weinfeld and a jury in October 1966, for stealing an interstate shipment of jewelry on November 8, 1963.

The jewelry was in a station wagon bearing six messengers employed by AAA Jewelry Service—Moots, Figueroa, Kreisman, White, Tretter and Savoca. The station wagon was overtaken by a black sedan bearing two men dressed in police uniforms. One, allegedly Kapatos, directed Moots, the driver, to pull over and, on the latter's doing so, drew a pistol and said "Get out. This is a hold-up." Two more men, carrying pistols and wearing masks, positioned themselves on either side of the station wagon. As the six AAA employees emerged, they were ushered into a panel truck driven by a fifth man and were shackled and handcuffed by the two masked men. The black sedan followed the truck. With the bad luck that happily so often attends such ventures, the "policemen" were unable to drive the station wagon because it had a standard gear shift which they did not know how to operate. One of them, a man who was between five feet ten and six feet in height, weighed between 180 and 200 pounds, and had a red crop of hair, approached Mullett, an iron-worker fore-

---

1. We affirmed without opinion Judge Weinfeld's denial of the first petition, which raised a point different from that here at issue; certiorari was denied, 393 U.S. 852, 89 S.Ct. 93, 21 L.Ed.2d 122 (1968). Denial of the second petition rested on a technical ground which the third petition cured.

man who was working nearby, and asked whether he knew how to drive a standard shift car. Mullett answered affirmatively and went to the car, but on observing its contents and hearing a shouted warning from his fellow workers, he decided to have no part of the job.

The only substantial issue at Kapatos' trial was identification. The Government presented no other evidence connecting him with the crime, he did not take the stand, and the defense offered no alibi. With varying degrees of certainty, Kreisman, Figueroa, White and Moots made in-court identifications of Kapatos as one of the two men who had approached the station wagon. These were bolstered by reference to out-of-court identifications made by Kreisman, Figueroa, and White approximately two years after the robbery. Tretter and Savoca said they would not be able to identify the robbers if they saw them again. Mullett, two other iron-workers and a sidewalk frankfurter vendor testified that Kapatos was not the "policeman" who had solicited Mullett's aid, and a nearby shop-keeper testified he was not the man who had hurriedly bought a jacket some six hours later. The Government explained this testimony by asserting that Kapatos, who apparently bore no resemblance to Mullett's description, was the other "policeman."

The defense naturally attacked the identifications. It brought out that shortly after the robbery a New York City policeman had accumulated photographs of various suspects, including Kapatos; that he had handed these to one Orbach, an officer of AAA, with the request that Orbach display them to the six messengers; and that he made no arrests as a result. On its own examination of Kreisman, who made the most positive identification, the Government elicited that his first sight of Kapatos after the robbery was in November 1965 when two F.B.I. agents took him to view Kapatos on Delancey Street underneath the Williamsburgh Bridge where Kapatos was working. Figueroa who, viewing Kapatos in court, could say only that Kapatos looked like the man who approached the AAA car, stated that in November 1965 two F.B.I. agents took him and Moots "to recognize" Kapatos and that he then thought Kapatos "was very much alike to that man who stop us." Moots was somewhat less sure. White thought Kapatos looked "very much like" the man who had approached the car. The Government brought out that in December 1965, F.B.I. agents had taken White to view Kapatos in front of a restaurant, and he had then made an identification. Cross-examination of Mullett disclosed that the F.B.I. had shown him a photograph of Kapatos, had taken him down to the north side of the Williamsburgh Bridge where Kapatos was working, and had asked him whether Kapatos "was the fellow who couldn't drive the stick shift." As indicated, Mullett's answer was negative. Practically the sole issue for the jury was the credibility of the identification testimony; the prosecutor said in summation that if the jurors didn't believe Kreisman, they should not convict.

An appeal was taken to this court. A principal point in appellant's brief was that "The prior show-up suggestive identification procedure under the circumstances was a flagrant violation of the 'due process of law' clause of the Fifth Amendment to the U. S. Constitution." The brief vigorously contended that the one-to-one exhibition of Kapatos to Kreisman, Figueroa, Moots and White was unduly suggestive and cited Mullett's testimony to support this claim. The error was said to be "much more flagrant" than in Wade v. United States, 358 F.2d 577 (5 Cir. 1966), which then had not yet been reviewed by the Supreme Court. We affirmed without opinion.

A petition for certiorari was filed prior to the Supreme Court's decisions of June 12, 1967 in the *Wade-Gilbert-Stovall* trilogy, 388 U.S. 218, 263, 293,

87 S.Ct. 1926, 1951, 1967, 18 L.Ed.2d 1149, 1178, 1199, but the Government's memorandum and petitioner's reply brief were filed thereafter, and the latter made extensive reference to those cases. The brief supporting the petition argued, as had the brief in our court, that the identification procedures, especially the show-up of Kapatos to Kreisman under the Williamsburgh Bridge, were impermissibly suggestive and cited the lower court decisions in *Wade, Gilbert* and *Stovall*. The Court denied certiorari on October 9, 1967, 389 U.S. 836, 88 S.Ct. 46, 19 L.Ed.2d 97.

The instant petition under 28 U.S.C. § 2255 was founded on three affidavits, one by Isidore Zimmerman, an investigator employed by Kapatos' counsel, another by Mullett, and a third by Theodore Rosenberg, co-counsel at Kapatos' trial and his counsel in this proceeding.[2] All that Mullett's affidavit added to his trial testimony was that when he was taken to the construction site under the Williamsburgh Bridge, the agents told him not simply that he was to look at a suspect, which was surely inferable from his testimony, but that they thought they had "a very good suspect," who would be pulling up in a car they described, and also that there was an attempted voice identification—all, as stated, unsuccessful. After interviewing Mullett, Zimmerman went to AAA's office, where he encountered Orbach, Moots and Figueroa. The two latter reminded Zimmerman that they did not positively identify Kapatos. When Zimmerman asked whether they were influenced in any way by the F.B.I. in the identification on Delancey Street, Orbach refused to let them answer but they allegedly said, "I did not identify the defendant at Delancey Street." Zimmerman was unable to locate Figueroa afterwards, and White refused to give any information

without clearance from the F.B.I. and the United States Attorney. Although he promised to call Zimmerman after receiving such clearance, he never did; whether he ever called the F.B.I. or the United States Attorney, we do not know. A visit by Zimmerman to Moots' home was unproductive. Kreisman also declined to answer the investigator's questions. Judge Weinfeld denied the petition without an evidentiary hearing, and this appeal followed.

In Sanders v. United States, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963), the Supreme Court, dealing with the provision of § 2255 that "The sentencing court shall not be required to entertain a second or successive motion for similar relief on behalf of the same prisoner," held that this should not be read so as to apply a res judicata standard to successive applications by federal prisoners. Rather the provision "is to be deemed the material equivalent of § 2244" (dealing with successive habeas corpus petitions by state prisoners), 373 U.S. at 14, 83 S.Ct. at 1076. In either case, the denial of a prior petition may serve as the basis for refusing a hearing on a later petition only if three conditions are met: (1) the ground urged in both applications must be the same; (2) it must have been determined adversely to the applicant on the merits on the prior petition; and (3) reaching the merits on the subsequent application would not serve the ends of jusitce, 373 U.S. 15, 83 S.Ct. 1068.

Six years later in Kaufman v. United States, 394 U.S. 217, 227 n. 8, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1969), the Court indicated that the *Sanders* criteria would govern a § 2255 petition setting forth claims which had earlier been urged and determined adversely to the petitioner at the trial and appellate levels.

---

**2.** Rosenberg stated that Lopez, the other trial counsel, told him that prior to the trial Lopez was standing with Kapatos in front of a courtroom in the Federal Courthouse when the courtroom door opened and a Federal agent led the Government witnesses past them. This episode, which of course was well known to defendant and his counsel, had been brought out at the trial, and is not of sufficient significance to require further discussion.

In that case the claim had been raised and ruled against at trial and, although counsel elected not to press it on appeal, Kaufman himself had brought it to the attention of the appellate court, which, however, did not mention the point in its opinion.[3] See 394 U.S. at 220 n. 3, 89 S.Ct. 1068. Mr. Justice Brennan disposed of the "bald statement, variously expressed, that a motion under § 2255 cannot be used in lieu of an appeal" on the basis that this did not apply to constitutional claims, 394 U.S. at 222–223, 89 S.Ct. at 1072. However, he qualified this by saying that "[W]here a trial or appellate court has determined the federal prisoner's claim, discretion may in a proper case be exercised against the grant of a § 2255 hearing," by referring to the *Sanders* criteria, and by adding that "where the trial or appellate court has had a 'say' on a federal prisoner's claim, it may be open to the § 2255 court to determine that on the basis of the motion, files, and records, 'the prisoner is entitled to no relief.'" 394 U.S. at 227 n. 8, 89 S.Ct. at 1074. Both in the footnote and at 394 U.S. 230–231, 89 S.Ct. 1068, he cited with approval Judge J. Skelly Wright's dissent in Thornton v. United States, 125 U.S.App.D.C. 114, 368 F.2d 822, 831 (1966). There, after a somewhat similar statement, Judge Wright posed four cases that in his view would require § 2255 relief despite a previous opportunity to ventilate or even actual ventilation of a constitutional claim. These were: (1) where a federal trial or appellate court said nothing because the issue was not raised; (2) where it was unclear whether the 'say' was on the merits; (3) where new law had been made or facts uncovered relating to the constitutional claim since the trial and appeal; and (4) where the trial or appellate court based its rulings on findings of fact made after a hearing that was not full and fair.

Kapatos' case does not fall under any of these rubrics. The issue of impermissibly suggestive identification was clearly raised in the briefs to this court, and our negative 'say', even though not expressed in an opinion, must have been on the merits. The hearing at Kapatos' trial was full and fair. Kapatos concedes that the principles first enunciated in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, do not apply to his case. He does assert, however, that the opinion in Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, "advanced an innovated concept regarding a due process violation with respect to a pre-trial identification procedure." But the *Stovall* opinion does not read as if the Court thought it was making new law in holding that an impermissibly suggestive identification violated due process. It referred to this as "a recognized ground of attack upon a conviction independent of any right to counsel claim," 388 U.S. at 302, 87 S.Ct. at 1972, citing Palmer v. Peyton, 359 F.2d 199 (4 Cir. 1966), and indicated that for that very reason state convictions already final were still subject to attack by federal habeas on that basis although not for violation of the newly announced line-up rules.

We are thus left only with the asserted discovery of new evidence relating to the constitutional claim. If the petition had alleged any new evidence that would have significantly buttressed the claim of impermissibly suggestive identification, and if this was not discoverable before the trial in the exercise of reasonable diligence, we would indeed direct a hearing; a conviction resting solely on identifications alleged to have been impermissibly suggestive ranks high on the list where reexamination on collateral attack is warranted if a sufficient basis is shown. Cf. United States v. Miller, 411 F.2d 825 (2 Cir. 1969). But the petition here did not measure up

3. A note, Developments in the Law—Federal Habeas Corpus, 83 Harv.L.Rev. 1038, 1064–66 (1970), suggests that this uncertainty whether the court of appeals considered Kaufman's claim is the reason why the Supreme Court allowed relitigation.

to that standard. While it added some details as to F.B.I. conduct with respect to Mullett, these could readily have been developed on cross-examination at the trial and, in light of Mullett's trial testimony that Kapatos was not the man who approached him, no harm was done in any event. What we are asked to conclude is that the likelihood of the agents' having made the same kind of remarks to Kreisman and the other three identification witnesses is sufficient to call for a hearing. But even if a hearing were to show that similar remarks were made, which is sheer speculation, this would have added little to what the jury already knew about the suggestive nature of the pre-trial identifications, and the whole subject of what the agents said to the four witnesses at their respective pre-trial confrontations with Kapatos could readily have been developed.[4] We read the remark allegedly made by Figueroa and Moots to Zimmerman as saying only that they had been no more positive on Delancey Street than they were in court—not that they were recanting testimony they had given. Here again the whole matter of their prior identifications was on the record and could have been explored at trial if defense counsel had so chosen. In sum, the petition leaves us with no more belief than was entertained by the able and conscientious district judge that a hearing would add anything of significance to what was or could have been developed at the trial over which he had presided.

We thus find no mandate in *Kaufman* for allowing further litigation of the very claim of impermissibly suggestive identification that was decided against Kapatos when, some months after *Stovall*, the Supreme Court declined to review our affirmance of his conviction. Cf. Slawek v. United States, 413 F.2d 957, 959 (8 Cir. 1969) (Blackmun, J.); Developments in the Law—Federal Habeas Corpus, 83 Harv.L.Rev. 1038, 1064–66 & n. 144 (1970).

Affirmed.

---

4. Since the Government had brought out the prior one-to-one identifications, the defense had nothing to lose by probing into the circumstances.