**UNITED STATES of America,**
**Appellee,**

v.

**Thomas CALLAHAN and Thomas Kapatos, Appellants.**

**Nos. 444, 462, Dockets 35231, 35642.**

United States Court of Appeals, Second Circuit.

Argued Jan. 20, 1971.

Decided March 22, 1971.

John R. Wing, Asst. U. S. Atty., New York City (Richard Davis and Jack Kaplan, Asst. U. S. Attys., and Whitney North Seymour, Jr., U. S. Atty. S.D.N.Y., New York City, on the brief), for appellee.

Herald Price Fahringer, Buffalo, N. Y. (Theodore Rosenberg, Brooklyn, N. Y., and Lipsitz, Green, Fahringer, Roll, Schuller & James, Buffalo, N. Y., on the brief), for appellants.

Before MEDINA, HAYS and ANDERSON, Circuit Judges.

MEDINA, Circuit Judge:

Thomas Callahan and Thomas Kapatos appeal from convictions for conspiring to rob a bank money truck in violation of 18 U.S.C. Section 371 (1964) and for transporting a stolen automobile in interstate commerce in violation of 18 U.S.C. Section 2312 (1964). Each of the appellants was sentenced to consecutive five-year terms on each count. The grand jury had returned a nine-count indictment against Callahan and Kapatos, but most of the charges were dismissed for lack of venue and one for failure of proof.

■ On December 21, 1964 at Paterson, New Jersey, four armed men made off with over $500,000 in United States currency that was being transported in a panel truck of the First National Bank of Passaic County, the deposits of which were insured by the Federal Deposit Insurance Corporation. Not a penny of this large sum has ever been recovered. The robbery was planned with such meticulous attention to detail that the robbers made their escape leaving behind only the handcuffs and pieces of cord used to truss up the guards and others. The task of solving this crime was one of unusual difficulty but, as a result of several years of persevering investigation, the bits of evidence pieced together at the trial furnished a firm basis for the finding of the jury that both Callahan and Kapatos were beyond a reasonable doubt guilty of the crimes charged.

We are asked to reverse and to dismiss the indictment or to remand the case because of numerous errors alleged to have been committed by Judge Murphy in his rulings at the trial. Some of these claims of error we pass over as clearly lacking in merit. Others can only be understood when viewed against the background of a most complicated aggregate of various detailed proofs, to which appellants' briefs make only passing reference, and which are woefully scrambled in the Government's answering brief. After these items of proof have been pieced together in proper perspective, we believe the points of law will be more readily understood.

Callahan is enlarged on $100,000 bail pending the disposition of this appeal. Kapatos is serving a seven and one-half year sentence on an earlier conviction in the Southern District of New York for armed theft of an interstate jewelry shipment, to which further reference will be made later.

I.

*The Development of the Conspiracy and How It Resulted in the Robbery at St. Anthony's Rectory on December 21, 1964*

The Market Diner near Pier 90 at West 51st Street in New York City was a sort of gathering place for men who

more or less worked in the neighborhood. The individuals with whom we are concerned in this case are Thomas Callahan, Frank Campbell, Thomas Kapatos, John Pierce, Henry Speditz—all named as defendants in the indictment—and Charles Roberts, a member of the conspiracy to rob the bank's money truck, who testified for the Government. Most or all of these men had served terms of imprisonment for the commission of crimes of violence, possession of firearms and the stealing of automobiles.

Roberts, who had known Callahan, Campbell, Kapatos, Pierce and Speditz for many years, testified that Pierce, who worked on Pier 90, came to him in January or February, 1964, and said he had discovered a "score" or opportunity to obtain a large sum of money by robbing a bank money truck in Paterson. The two men then proceeded to Paterson in Pierce's car, which was "clean." This meant it was not stolen but was legally owned by Pierce. They surveyed the terrain, became familiar with the route taken by the money truck on Mondays as it delivered bags of currency from the main office to the various branch banks, and returned confident that the scheme to rob the money truck was feasible. They had looked in the money truck and had seen the bags. Pierce even went right into the main office of the ·bank and saw the bundles of currency put in the bags. So they knew money was in the bags. It was noted that a simple panel truck, rather than an armored car, was used, and there were only two guards. Then Campbell joined the others in the venture, and Pierce suggested they bring in his friend Kapatos who was said to possess several garages in New Jersey, in one of which he had a stolen car loaded with all the equipment and paraphernalia that would be needed in the robbery, such as a machine gun, pistols, Army clothes and field jackets and so on. There were several further trips in Pierce's car to reconnoiter the Paterson area and Kapatos liked what he saw. It was he who suggested the plan originally adopted.

This first plan was to intercept the money truck as it followed its regular Monday route on a street with an open lot on one side and a long factory with high dingy windows on the other. There were intersecting streets before and after passing the factory block. Kapatos's plan was to have a stolen station wagon drive in front of the money truck, slow it down, and then Kapatos, lying on the floor of the station wagon, was to drop the rear window and point his machine gun at the guards in the money truck a few feet behind. Another stolen car with a driver was to lie in wait in one of the side streets while the two other men approached the money truck from either side and overpowered the guards. Then the driver of the second car was to come up behind the money truck to take the loot.

It was apparent that this scheme required a fifth man, and Kapatos brought in his friend Callahan, who said "If Kapatos likes it, I like it." This was in late March or early April of 1964. After further driving around Paterson in Pierce's car, renting a store which they could use as a place of refuge if things went wrong and a small private garage "underneath a house" in which to keep a stolen car, the five men met in New York to discuss what to do next. After some talk it was agreed by all that it was necessary to steal a station wagon and "each and every one of us was to be on the alert in regards to stealing a station wagon." Within a week Kapatos phoned Roberts at his home in Astoria and said he had stolen a station wagon outside of the Copacabana night club in New York City, and for "the rest of us" not to bother about it. He described it to Roberts as long, having lots of windows, a light blue or light green Oldsmobile, with an air conditioning unit in it. It turned out to be a 1962 Mercury. So Kapatos brought the stolen station wagon to Pier 90, and he and Roberts, together with Campbell and Pierce, changed the plates in the street and the four men started for New Jersey. Kapatos drove the station wagon and the others fol-

lowed in Pierce's car. The time of this is given by Roberts as "some time in April of 1964." On the way out to Paterson they stopped at Fort Lee where Kapatos lived in an apartment house. Upon arrival in Paterson the stolen station wagon was placed in the little one-car garage they had previously rented, and all four returned to New York in Pierce's car.

We pause for a brief digression, as this station wagon will become one of the important links in the chain of proof corroborating the testimony of Roberts. We shall in a moment review Roberts's description of two abortive attempts to rob the money truck in the street alongside of the factory. Roberts participated in these two abortive attempts and then he and Campbell retired from the conspiracy. Until Roberts told his story to the FBI several years after the spectacular robbery at St. Anthony's Church Rectory on December 21, 1964, neither the FBI nor anyone in the prosecutor's office investigating the crime had ever heard of any station wagon, as no station wagon played any part in the robbery at the Rectory. Roberts's recital of the facts concerning the first two abortive attempts, however, gave the FBI for the first time his statement that "some time in April" 1964 Kapatos had stolen a station wagon, containing an air conditioning unit, from the street near the Copacabana in New York. So, upon further investigation it was discovered the police record indicated that such a station wagon had been reported as having been stolen at the Copacabana on April 18, 1964. And a member of the police force of East Paterson testified this station wagon was found abandoned in the extreme westerly corner of a parking lot at the Elmwood Shopping Center, near Paterson on Route 4, on July 25, 1964. The owner, Edward Lebowitz, was located and he confirmed the fact that the car was stolen at the Copacabana on April 18, 1964. And this very parking lot at the Elmwood Shopping Center was the place where Roberts had said the robbers switched cars at the time of the two

abortive attempts to rob the money truck. That Roberts could have manufactured out of whole cloth the story about the station wagon with an air conditioning unit stolen from the Copacabana and then have it all fortuitously come true strains credibility far beyond the breaking point.

It requires no more than a few sentences to describe the two abortive attempts in the Spring of 1964. Five men participated in each of these two attempts, including Roberts. They drove out to Paterson in Kapatos's "clean" Oldsmobile after picking up Kapatos's stolen Buick at his garage in West New York, N. J. with all the equipment. At the Elmwood Shopping Center they left the "clean" car, then in the stolen Buick they proceeded to the garage "underneath the house" where Campbell and Kapatos picked up the stolen Mercury station wagon. Callahan and Roberts were at their respective stations in the factory street, while Pierce sat waiting in the stolen Buick, but the money truck went by and no Campbell and Kapatos in the stolen station wagon. They arrived in a minute or two and said Kapatos thought a police officer was observing them and he called the deal off. On the next abortive attempt two weeks later they did the same thing but Campbell made a wrong turn and the money truck went by. This led to an explosive scene with Kapatos heaping abuse upon Campbell and generally making himself objectionable. So Roberts and Campbell pulled out of the conspiracy. But the others urged them from time to time to return, which they refused to do. Another incident that might have contributed to this split-up was a conversation about four new hand guns Kapatos had received from Boston. He said they were of superior quality and should be used in the robbery in Paterson. Callahan violently disagreed on the ground that if any of them was picked up with one of these guns in his possession it might be identified as having been used in some robbery in Massachusetts and then they would be in real trouble. The

rest agreed with Callahan. Campbell died of a heart attack on October 4, 1964.

We must reconstruct the actual robbery on December 21, 1964 from the proofs of what occurred and by piecing together the testimony of various witnesses. A change in the regular Monday route of the money truck now called for a few stops to pick up the receptacles containing the Sunday collections of several churches, and then stops at various branch banks to drop off the bags of currency that had been requisitioned from the main office. The robbers no longer needed the machine gun or the Mercury station wagon, and so this car was abandoned in the parking lot at the shopping center in July. But the robbers still needed two stolen cars, as we shall see.

The plan of St. Anthony's Church Rectory (Gov't Exhibit 1) shows the entrance door from the street leading to a group of small waiting rooms and an office. There is a passage on the left providing access to and from the Church. As the Church was open to the public, it was a simple matter for these professionals, even with their equipment, to enter the Church, go up the passage and congregate in the vestibule behind the entrance door at about 8:50 A.M., precisely the time they expected the money truck to arrive. Several priests and a caretaker, who was the father of one of the priests, arrived there too, but they were quickly handcuffed, their legs tied and a strip of tape placed over the mouth of a priest who cried out. Each of the three robbers in the vestibule had a pistol. The panel truck pulled into the driveway of the Rectory, the two guards came to the door and rang the bell. The doors were flung back and the guards were handcuffed, their legs tied and they were pushed to the floor with their faces to the wall in less time than it takes to tell about it. One of the robbers pointed his pistol at the guard who had the key to the back and only entrance to the body of the panel truck, and the robber said "Give me the key or I'll blow your brains out." The key was forthcoming and the robbers rushed out. In the meantime, the fourth robber, who had been driving nearby in a black Chevrolet sedan, pulled up alongside the money truck and the transfer of the money bags from the panel truck to the black Chevrolet sedan was quickly effected. Nor were the receptacles containing the Sunday collections at St. John's Cathedral, St. Boniface Church and that of St. Anthony's Church itself left behind by the robbers. These collections brought the total loot to $517,-721.49. The men who had been handcuffed and tied up said the robbers wore face masks, cloth gloves, shiny rubbers, two pairs of trousers each and Army jackets. Sister Olympia, one of the nuns who lived in the Convent on the other side of the Church, was slowly passing in a car with Mrs. Bice Mascuilli and they first thought it was a funeral. Sister Olympia observed a man who wore a mask carrying a bag from the truck to the Chevrolet.

The pieces of white cord used to truss up the priests and the guards were destined to be of great significance in the investigation that followed. Two stolen cars were destined to connect Callahan, Kapatos, Pierce and Speditz with the robbery of December 21, 1964. And a variety of more or less fortuitous occurrences contributed to the solution of the crime.

That each and every one of these professional robbers was skilled in the art of stealing cars, locked or not, may be inferred from the joint decision, participated in by Callahan and his four confederates, to the effect that each would be on the alert to steal a station wagon at the first available opportunity. And each of the robberies or attempted robberies described in the proofs required the use of a number of stolen cars, so that any identifications by bystanders of the make, description and license numbers of cars participating in the robbery could not be connected up with the perpetrators of the crime. All this, however, proved unavailing to Callahan and Kapatos.

The black Chevrolet in which the four robbers escaped with the loot was found a few days after the robbery in a parking lot 6 or 7 miles from the Rectory, in nearby Hackensack. White paint scrapings on the right front fender upon laboratory examination were found to be identical with the white paint on the door frame and door of Pierce's garage. On January 22, 1965 the right door frame of this garage had black scrape marks at about the same height as the black Chevrolet's right front fender. The car belonged to William Rubin. It was a 1964 four-door Impala black Chevrolet sedan and was stolen on October 21, 1964, almost right under Rubin's nose, from the place he had parked it on the Brooklyn side of the Verrazano Bridge. Rubin testified the Chevrolet was practically a new car and there was no white paint on the right front fender before it was stolen. An electrician's knife which did not belong to Rubin was found on the front seat, and it was of a type that would have been useful in cutting off lengths of rope or cord such as those used to truss up the priests, the caretaker and the guards in the Rectory. Rubin also testified there were two beach chairs and a red quilt in the Chevrolet when it was stolen. These were found after the robbery in the apartment of Speditz in the Bronx, where he and Callahan were living, and Rubin identified these as the same articles that had been in his car when it was stolen.

Another stolen car was found on December 21, 1964, the very day of the robbery, a short distance from the Rectory on the same block where the original group of five had planned to intercept the money truck as it passed the factory. This was an Aqua Blue Bel Air 1964 Chevrolet four-door sedan. It belonged to Eugene Iacovella. Mrs. Iacovella testified it had been stolen from the parking lot of Alexander's on Route 4 at Paramus on November 7, 1964. When the car was stolen a pair of slacks belonging to Iacovella's daughter was in the trunk of the car. These slacks were being taken back to the store because the zipper was defective. There also was in the trunk of the car something less than 100 feet of white nylon cord, such as is used for Venetian blinds. When Iacovella opened the trunk of the car at the police garage, he found his daughter's slacks were gone and 44 feet of the nylon cord were also missing. He found a black leather pistol holster that did not belong to him and was not in the car when it was stolen. It requires little imagination to deduce that the pistol holster was left there by the robbers. There was expert testimony to the effect that the portion of Iacovella's cord left in the car was identical in diameter, color, composition and in every observable respect with the pieces of cord that had been used to tie up the priests, the caretaker and the guards; and the girl's slacks, defective zipper and all, were found in the Speditz apartment while he and Callahan were living there together. The various articles taken from the Speditz apartment were discovered pursuant to the authority of a search warrant.

So, reconstructing the crime, we think it highly probable that Callahan, Kapatos, Pierce and Speditz arrived at the switching place on December 21, 1964 in three cars, that they left Pierce's "clean" car in some parking lot and proceeded with the two stolen Chevrolets, Rubin's black Impala, and Iacovella's Aqua Blue Bel Air, to the vicinity of the Rectory. The Iacovella car was used to take three of the robbers close to the Church so they could get in to the vestibule of the Rectory at just the right time. Then, if anything went wrong, this same car could be used for a getaway. As it happened, the scheme succeeded beyond their expectations and they all departed in the black car and left the Aqua Blue Bel Air in the street.

## II.

### What Occurred After the Robbery

The details of the identification procedures, which are attacked by appellants as lacking compliance with constitutional

standards, and the alleged illegal search of the person of Callahan in Miami Beach on January 22, 1965, will be discussed later in this opinion when we come to the law points.

On January 1, 1965 Callahan was observed with an unidentified man driving off in Kapatos's new 1965 green Oldsmobile with clothing and packages from the Speditz apartment. Speditz and Callahan also bought new cars. Both Speditz and Callahan were seen in Miami Beach, Fla., in January, 1965. In March, 1965 Roberts had several significant conversations with Kapatos and with Callahan. Indeed, Kapatos spoke to Roberts often about the robbery, telling Roberts that his own share of the loot was over $100,-000 and asking his cooperation in putting a portion of this sum out at loansharking interest or in gambling at the waterfront. But Roberts held off. In one of these post-robbery conversations with Callahan, the latter remarked "Aren't you sorry that you didn't have a hunk of that score."

Neither Callahan nor Kapatos testified in his own defense; and Kapatos's weak alibi was pretty well battered by the evidence produced by the Government in rebuttal.

It is worthy of comment that the prosecutor, Assistant United States Attorney John R. Wing, conducted the Government's case with singular poise and composure, in the face of what must have seemed to him to be provocative dilatory tactics, and his masterful summation pulled all the threads together.

We have been at some pains, after a study of every page of the transcript, and a view of all the exhibits, to set forth a summary of the proofs, not only to make plain the undoubted guilt of Callahan and Kapatos, but, hopefully, to forestall some of the usual applications for post-conviction remedies, which now have so increased in volume as to constitute a serious problem of administration in the federal courts.

We turn to the law points.

### III.

### *Hearsay Before the Grand Jury*

██ We are asked to reverse the judgments of conviction of Callahan and Kapatos and to dismiss the indictment because none of the forty-odd witnesses who testified at the trial was called before the Grand Jury. But the situation here is for all practical purposes the same as in United States v. Costello, 221 F.2d 668 (2d Cir. 1955), affirmed, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), with the difference that the intricate and complicated details of *Costello* involved an alleged income tax fraud, whereas here the intricate and complicated details have to do not only with the four priests, the caretaker and the two guards who were trussed up and other witnesses at the scene of the robbery, which no one disputed, but also with expert witnesses on the subject of the rubber band found on Callahan, the paint particles and wood fragments connecting the stolen black Impala Chevrolet with Pierce's garage and the comparison of the cord used to bind the victims with the remaining 42 feet of the identical cord found in the abandoned Aqua Blue Bel Air Chevrolet. A dozen or more witnesses contributed small individual details which in the aggregate unfolded the story of the four stolen automobiles. And so on. It would have served no useful purpose to have produced this array of witnesses or any of them before the Grand Jury. The only result would have been needless expense to the Government and great inconvenience to the witnesses, many of whom lived at considerable distances from the federal courthouse in New York City. The Grand Jury minutes were unsealed so that we might see them, although these minutes were not shown to counsel for Callahan and Kapatos. We have read these minutes and there is no doubt the Grand Jury knew and was told that what was placed before it was hearsay.

The insistence by appellants that the failure to produce Roberts and Sister Olympia before the Grand Jury consti-

tutes a fatal defect comes with exceedingly ill grace, as there had been two attempts to murder Roberts, one in November of 1965, when he was shot in the chest, but survived, and another in August, 1967 when he was blown up by a bomb in his car but survived, minus one leg and with his right arm crippled for life. The FBI discovered that a third attempt was being planned and managed to get him out of the way. The Government also represents that the two remaining conspirators, Pierce and Speditz, were "executed," which we suppose means murdered, in or about December, 1965. The record does not disclose the identity of the persons who masterminded the attempt to murder Roberts or whether the doing away with Pierce and Speditz was for the purpose of forestalling some attempt to assist the Government in its prosecution of Callahan and Kapatos or to make off with the share of the loot allotted to Pierce and Speditz. In any event, no word of any of these murders and attempted murders was mentioned in the presence of the jury. As to Sister Olympia, as we shall soon see, her recognition of Kapatos by his voice when he complained in no uncertain terms at having his picture taken while in one of the rooms of the federal courthouse in Newark, N. J., on January 25, 1965 was not known to the FBI when the case was presented to the Grand Jury. The reason it was not known was that she was asked if she recognized anyone connected with the robbery and she thought this referred only to the masked man she saw carrying a bag from the panel truck to the black Impala Chevrolet and not to the beggar who on two prior occasions had come to the Convent asking for food. Even if this were not so, the Government was under no obligation to offer Sister Olympia, or any other particular person, as a witness before the Grand Jury.

This Court has never dismissed an indictment because the indictment was supported only by hearsay,[1] and this statement applies both before and after the classic statement by Judge Learned Hand in *Costello*, 221 F.2d at page 679.

## IV.

### *Callahan and the Rubber Band*

On January 22, 1965 at 9:30 in the morning three FBI agents requested admission to Callahan's room in the Ocean Haven Hotel in Miami Beach, Fla. He let them in and they told him they would like to have him come with them to the FBI office. He was told that they wanted to see him in regard to the currency truck robbery in Paterson in December, 1964, that he did not have to consent to the interview, that any statements he made could be used against him in a court of law, and that he had a right to consult an attorney before making any statement. This was long prior to *Miranda*[2] and was in accord with what had been for many years standard FBI procedure. He was also told he was not under arrest and did not have to come with the agents. He readily agreed, however, and went with them to the FBI office after putting on his trousers, a T-shirt and his shoes. At the office he told the agents he knew his rights and had no intention to answer any questions whatever. Moreover, he refused to be fingerprinted or to be photographed. When asked if they might "pat him down" he said "yes," and in the process of patting down one of the agents felt a slight bulge in the waistband of the trousers. This turned out to be a slit in the waistband and in this slit, which formed a sort of small pocket, was a rubber band. Callahan made no protest or

1. The writer of this opinion still believes there was some merit in his dissent in United States v. Beltram, 388 F.2d 449, 451 (2d Cir.), cert. denied, 390 U.S. 1017, 88 S.Ct. 1273, 20 L.Ed.2d 168 (1968) but that dissent remains only a dissent from the prevailing view, and it was applicable only to a particular undesirable practice in narcotics cases which has long since been abandoned.

2. See n. 4, *infra*.

objection and said he didn't know what it was. He produced some bills and handed them over. He took off his trousers and they were examined without result. The rubber band, which at the time no one thought had any significance, was thrown on the table and he said they could have it. After taking the money produced by Callahan and returning an equivalent amount to him, the rubber band was put around the bills he produced, in the sum of about $140, and the bills were sent to the FBI Laboratory in Washington for examination.

Callahan's version of the incident, given at a hearing in the absence of the jury, was understandably quite different. He said the agents rushed in guns in hand and that he was considerably manhandled and pushed about despite his vigorous protests. His memory with respect to the rubber band did not seem to be very good. He thought he took it out of his pocket and handed it to the agents. In one of his affidavits used in support of one of the numerous pre-trial motions he gave the impression that the agents found it in the course of an allegedly illegal search of his room.

■ In any event, Judge Murphy concluded that he believed the agents and did not believe Callahan, so the motion to suppress, based upon an alleged violation of Callahan's constitutional rights, was denied.[3] We find no error here.

■■ If an individual unequivocally, freely and intelligently gives his consent to a search of his person, there is no violation of his constitutional rights (United States v. Smith, 308 F.2d 657 (2d Cir. 1962), cert. denied, 372 U.S. 906, 83 S.Ct. 717, 9 L.Ed.2d 716 (1963)), and whether or not such consent has been given is primarily a question of fact, better left to the trial judge, who must pass upon the credibility of the witnesses. United States v. Cachoian, 364 F.2d 291 (2d Cir. 1966), cert. denied, 385 U.S. 1029, 87 S.Ct. 757, 17 L.Ed.2d 676 (1967); Unit-

ed States v. Thompson, 356 F.2d 216 (2d Cir. 1965), cert. denied, 384 U.S. 964, 86 S.Ct. 1591, 16 L.Ed.2d 675 (1966).

■ We infer from Callahan's complaisance that he really did know his rights, as he answered no questions, and refused to be either photographed or fingerprinted. But he had altogether forgotten about the rubber band and, feeling quite positive that the money in his pocket was no part of the loot and that his trousers contained nothing that could possibly incriminate him, he was quite willing to have the FBI examine his trousers till the cows came home. This was, we think, a quite adequate explanation of his conduct. United States v. Curiale, 414 F.2d 744, 747 (2d Cir.), cert. denied, 396 U.S. 959, 90 S.Ct. 433, 24 L.Ed.2d 424 (1969).

As the evidence at the trial disclosed, this was not an ordinary rubber band but one 3 inches long by 3/8 of an inch in width, of amber color, precisely the same as the rubber bands used by the First National Bank of Passaic to bind the bundles of bills placed in the bags taken by the robbers from the panel truck at the Rectory on December 21, 1964.

## V.

### The Theft and Interstate Transportation of the Mercury Station Wagon

Callahan claims that the proofs are not sufficient to connect him with the stealing of the Lebowitz 1962 Mercury station wagon. He says he did not steal the car, that no witness testified that he ever rode in the car or that he knew it would be driven to New Jersey. But all this is beside the point and of no avail to Callahan.

■■ We have already seen the part stolen cars played in the development of the conspiracy charged in this case. The jury had a right to infer that Callahan, as well as Campbell, Kapatos, Pierce and Roberts, was ready, willing and able to

---

3. Although Kapatos joins Callahan in claiming the search was illegal, he is without standing to object to a violation of Callahan's Fourth Amendment rights. Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

steal the station wagon they needed for the machine gun operation, because the proof is they all agreed that "each and every one of us was to be on the alert in regards to stealing a station wagon." Callahan's acceptance of this responsibility was an inducement and encouragement to the others. Each was relying on what each of the others had agreed to do. Callahan had committed himself to the doing of an act in furtherance of the enterprise. This was all that was necessary to warrant a finding by the jury that he aided and abetted the others including Kapatos, who actually stole the car. Nye & Nissen v. United States, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919 (1949); United States v. Peoni, 100 F.2d 401 (2d Cir. 1938). And this was in accordance with the unexceptionable instructions given by Judge Murphy, which were deemed satisfactory by the defense. The requirement of interstate transportation was no more than a jurisdictional requirement satisfied by proof that Kapatos drove the car from New York to New Jersey. United States v. Blassingame, 427 F.2d 329 (2d Cir. 1970).

Callahan was charged as an accessory before the fact and thus a principal, under 18 U.S.C. Section 2 (1964). United States v. Pritchard, 55 F.Supp. 201, 203 (W.D.S.C.), affirmed per curiam sub nom. Waters v. United States, 145 F.2d 240 (4th Cir. 1944). We find no insufficiency in the proofs supporting Count 8 of the indictment as against Callahan.

## VI.

### Sister Olympia and the Identification Procedures

This brings us to the most interesting phase of the case. The disguises had been so cleverly devised that of the seven victims trussed up and the people passing by in the street not a single one could identify any of the four robbers, in court or otherwise. One of the priests saw a tuft of gray hair protruding from under the mask of one of the robbers but no one saw the face of any of them. The three inside robbers who trussed up the priests, the caretaker and the guards were described as one shorter than the two others, but all the victims were so frightened that they had little to offer that would help the investigators.

A few days after December 21, 1964 two FBI agents came to the Convent to see Sister Olympia, the nun who had reported seeing a masked man carrying a bag from the panel truck to the black Chevrolet. She was shown several photographs, including those of Callahan and Kapatos. The hope, of course, was she might recognize the man she had described. But she said she could not say he was the man shown in any of the photographs. Just before December 30, 1964 she said she had been thinking the matter over and would like to see the photographs again. So she did see them again and repeated what she had said before, that she could not say the man she saw at the time of the robbery was shown in any of the photographs. She added, however, that the photograph of Kapatos looked like that of a man who had twice come to the Convent a month or two before, begging for something to eat. And she further told the FBI agent that a slight growth of hair on the beggar's face was turning white and that he was dressed better than the usual alcoholic who comes to beg for food. There the matter rested for some time, as this information did not at the time seem to be of any particular significance.

As a result of the service of a number of Grand Jury subpoenas, all or most of the witnesses to the robbery and a number of suspects, including Callahan and Kapatos, were present in the antechamber adjoining the Grand Jury room in the federal courthouse in Newark, N. J., on January 25, 1965. The record before us does not disclose the names of those who testified before the Grand Jury, if any of them did, nor the subject matter of such testimony, if any. But a number

of the witnesses sitting on benches in the anteroom saw the people walking around. Father Kirk, who arrived at the Rectory a minute or two before the money truck, and who had been promptly yanked into the vestibule, handcuffed and tied up, had noticed that one of the robbers who had done this walked with a sort of limp or a characteristic manner of walking. He pointed out Callahan to the agents as the man who seemed to walk in this slightly unusual manner. No point seems to be made about this in any of appellants' briefs.

Adjoining the anteroom, however, was the Library of the United States Attorney and through the spaces over and between the rows of books a person, without being observed, could look into the next room. Two or three people were there, including a man sitting at a table. A number of the witnesses, including Sister Olympia, were placed behind these bookcases and they were told to look and see if any person appearing in the other room was recognized "as being associated with the bank robbery." No names were mentioned. Then, evidently as planned or directed by the FBI, Callahan, Kapatos and a man named Wilde walked, one by one, through the room where the man was sitting at a table. This man was evidently trying to take a photograph of Kapatos as he walked by and Kapatos saw him. Immediately, Kapatos began to complain and to object to having his picture taken. While Sister Olympia had not at first realized who he was, as soon as she heard his voice she knew it was the beggar who came to the Convent for food on the two occasions prior to the robbery. But she said nothing of this to the FBI agent who gave her the instructions as she had no reason to suppose the beggar was in any way "associated with the

bank robbery." Much later, presumably in connection with the preparation for the trial, she had further discussions with someone connected with the prosecution and she did tell him she had recognized the beggar by his voice on January 25, 1965.

At the trial Sister Olympia, viewing those present at the trial, could not say that she recognized anyone. But the FBI agents were permitted, over objection, to testify to the recognition, at the time of viewing the photographs, by Sister Olympia of Kapatos as the beggar and to supplement the testimony of Sister Olympia about recognizing the beggar by his voice at the courthouse in Newark by identifying as Kapatos the person to whom Sister Olympia was referring as the beggar.

The main thrust of the attack on Sister Olympia's testimony by counsel for Kapatos is that at a critical juncture Kapatos was deprived of the benefit of counsel. We are told Kapatos and Callahan had retained counsel who were in attendance to protect their rights in connection with the Grand Jury subpoenas that had been served on them, and that at the very least they should have been told that persons were looking at them from behind the bookcases and that they were entitled to the presence of a lawyer to represent each of them. Reliance is placed on a whole series of cases, including not only the trilogy of *Wade*, *Gilbert* and *Stovall*, but also *Miranda* and *Escobedo*.[4]

In addition to the Sixth Amendment claim it is contended that the lineup, if it can be called such, was unnecessarily suggestive and conducive to irreparable mistaken identity in the light of the totality of surrounding circumstances.

4. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); Miranda v. Arizona, 384 U.S. 436, 88 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).

■ By way of preliminary we hold there is nothing whatever in this record to indicate that there was any illegality or impropriety in serving these Grand Jury subpoenas requiring the presence outside of the Grand Jury room of a considerable number of those who knew something about the robbery, including a number of suspects who might or might not be willing to testify. We adhere to our ruling on the same subject in United States v. Corallo, 413 F.2d 1306 (2d Cir.), cert. denied, 396 U.S. 958, 90 S.Ct. 431, 24 L.Ed.2d 422 (1969).

### A.

■ That showing the photographs to Sister Olympia was a permissible procedure was the precise holding in Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); see also United States ex rel. Beyer v. Mancusi, 436 F.2d 755 (2d Cir. 1971). On the face of the evidence we have just summarized it is clear to us there was nothing suggestive about the way in which Kapatos was brought within the view of those behind the bookcases. No names were mentioned and the result of the inquiry concerning those connected with the robbery, including the masked man Sister Olympia had seen carrying the bag from the bank's money truck to the black Chevrolet, was completely negative. Neither the FBI agent in charge nor Sister Olympia was thinking of the beggar. It was only by a fortunate quirk of fate that Kapatos complained about having his picture taken, and Sister Olympia at once recognized the voice as that of the beggar. We reject the claim of suggestiveness as frivolous. And the same may be said of the objection to testimony by FBI agent James R. Laughlin identifying Kapatos as the person referred to by Sister Olympia as the beggar.

### B.

■ In answer to the contention that the refusal to exclude the testimony of Sister Olympia constituted a deprivation of the right to counsel under the Sixth Amendment we think it is sufficient to say: (1) The so-called lineup was not in any sense custodial; Kapatos was not under arrest nor was he subject to restraint of any kind; and he was not indicted until August 5, 1968, more than three years after the incident of January 25, 1965. (2) The incident in question occurred long prior to the decisions in *Wade*, *Gilbert* and *Stovall*, which were filed on June 12, 1967 and the new rulings changing the pre-existing law were held to have no retroactive effect. Whether or not a similar procedure under similar circumstances, occurring on a date subsequent to June 12, 1967 would be held to be illegal is not a matter before us for decision nor do we express any opinion on the subject.

We would be content to let the matter rest here but for the fact that there is an undertone or motif running through appellants' briefs which seems to challenge any and all identifications, from the time of the commission of a crime down to the date of the trial, where any stratagem or deceptive practice is adopted by law enforcement officers to facilitate the identification of a suspect by witnesses to the commission of the crime, unless the suspect has been warned in advance of his right to have a lawyer present. The point seems to be, from the moment suspicion, however slight, is directed to a person who may have had some connection with the commission of a crime, there is "a critical period," and no deceptive device or stratagem or effort that is in any way misleading can be resorted to by law enforcement officials to provide victims of the crime or witnesses with an opportunity to identify the suspect, unless the suspect is warned in advance and told not only that there will be, what counsel chooses to call a lineup or showup but that he is entitled to the presence of a lawyer to represent him at the viewing. If the suspect claims to be indigent and has no retained lawyer, it would be logical to suppose that the argu-

ment would include a requirement that he be told, if he could not hire a lawyer, one would be assigned to him free of charge. An elaboration of this contention is to the effect that, if it is known that the suspect already has a retained lawyer, law enforcement officers must refrain from having, through their agents or otherwise, any conversation or communication with the suspect without first obtaining permission to do so from his lawyer, as the Canons of Professional Ethics of the American Bar Association forbid a lawyer from communicating with the client of another lawyer without his consent or approval.

Of course, if there is a right to have a lawyer present in these cases of noncustodial identification procedures, law enforcement officials might as well shut up shop. For, if the lawyer is worth his salt, the first thing he will do is tell his client to make himself scarce, and no identification will be possible. Only those caught *in flagrante delicto* could ever be identified.

So, we think it proper to express our view that after the commission of a crime, in addition to the use of photographs, as permitted by *Simmons*, we can find nothing in *Wade, Gilbert, Stovall* or any other court decision banning stratagems or deceptive practices in general or preventing law enforcement officers from putting witnesses in a position to see or photograph a suspect in the neighborhood of his home, or at his work, playing golf or doing anything else in a public place. And all this, we think, can be properly done without letting the suspect know in advance that he is to be viewed or telling him he has a right to the presence of a lawyer. United States v. Black, 412 F.2d 687 (6th Cir. 1969), cert. denied, 396 U.S. 1018, 90 S.Ct. 583, 24 L.Ed.2d 509 (1970); United States v. Lipowitz, 401 F.2d 591 (3d Cir. 1968), cert. denied, 395 U.S. 924, 89 S.Ct. 1778, 23 L.Ed.2d 240 (1969); United States v. Quarles, 387 F.2d 551 (4th Cir. 1967), cert. denied, 391 U.S. 922, 88 S.Ct. 1815, 20 L.Ed.2d 659 (1968). We think the principles of these cases are not affected by the rulings in *Wade, Gilbert* and *Stovall*.

Other examples of perfectly proper practices that have often been used in the past, without criticism by the courts, and which doubtless to some extent may mislead a suspect, are the following. The use in automobiles or elsewhere of one-way glass windows so contrived that the person behind the window can see what is going on outside but passers-by or the individuals to be viewed as suspects cannot see those on the other side of the window. Cameras can be designed so as to look like the transits or theodolites used by engineers and surveyors.

In view of what we have just said, it is interesting to note that the very same Kapatos who was convicted in the case now before us was also convicted of armed robbery of a jewelry truck. The robbery of the truck occurred on November 8, 1963 and the trial took place in October, 1966. The car with the robbers followed the jewelry truck and edged it over to the curb of a street in New York City. The Government claimed Kapatos was on the front seat of the robbers' first car dressed as a policeman. The evidence was that the so-called policeman, holding a pistol, and his associates, two of whom wore masks, overpowered the driver and the six other occupants of the jewelry truck and put them "shackled and handcuffed" in the robbers' second car that had come up from the rear. The two masked robbers had come up on either side of the jewelry truck. But the whole scheme misfired because the robber who was to drive the jewelry truck off with the loot could not operate the particular kind of gear shift that was on the jewelry truck. The principal issue at the trial and on the appeal to this Court related to the testimony identifying Kapatos as the disguised policeman. This identification had been effected by taking one of the men who had been trussed up during the attempted robbery down to the very Delancey

Street job of Kapatos repeatedly referred to in the testimony in the case before us. But on the appeal to this Court from this prior conviction[5] and on the various post-conviction applications[6] no contention whatever was made that Kapatos was entitled to be warned before these one-to-one viewings and told that he had a right to have a lawyer present. The contentions all very properly clustered about the question of whether or not the manner in which Kapatos was brought within the view of the witness was "impermissibly suggestive." This, of course, is a proper subject of inquiry in the case of any identification proof, and this was true before June 12, 1967, as pointed out in *Stovall*.

█ The Canons of Professional Ethics of the American Bar Association which proscribe communications by a lawyer with the client of another lawyer without his consent or approval have no bearing whatever on the problems before us in this criminal case.

*Conclusion*

[█ The effrontery with which these desperate and dangerous men assault society with their repeated acts of criminal violence makes a mockery of the rules they ask us to apply favorably to their contentions for reversal of these judgments, as these very rules were formulated in the interest of justice and for the protection of the innocent. These appellants were entitled to a fair trial and that is what they got.

The judgments are affirmed; the $100,000 bail of Callahan is revoked; and it is ordered that the mandate issue forthwith.

---

5. United States v. Kapatos, affirmed from the bench on March 3, 1967 (2d Cir. Docket No. 30967), cert. denied, 389 U.S. 836, 88 S.Ct. 46, 19 L.Ed.2d 97 (1967).

6. Kapatos v. United States, first petition denied on November 30, 1967 (67 Civ. 3847) (S.D.N.Y.), affirmed from the bench on April 23, 1968 (2d Cir. Docket No. 32028), cert. denied, 393 U.S. 852, 89 S.Ct. 93, 21 L.Ed.2d 122 (1968); second petition denied on December 12, 1969 (69 Civ. 3930) (S.D.N.Y.); third petition denied on February 16, 1970 (70 Civ. 166) (S.D.N.Y.), affirmed, 432 F.2d 110 (2d Cir. 1970) (Friendly, J.), cert. denied, 401 U.S. 909, 91 S.Ct. 867, 27 L.Ed.2d 806 (1971).