**UNITED STATES of America,**
**Appellee,**

v.

**Loren Lee KING, Appellant.**

**No. 71–1680.**

United States Court of Appeals,
Eighth Circuit.

Submitted May 10, 1972.

Decided June 6, 1972.

**54**

Harry H. Smith, Sioux City, Iowa, for appellant.

Robert L. Sikma, Asst. U. S. Atty., Sioux City, Iowa, Evan L. Hultman, U. S. Atty., Gary E. Wenell, Asst. U. S. Atty., for appellee.

Before VOGEL, LAY and BRIGHT, Circuit Judges.

LAY, Circuit Judge.

Defendant was convicted on two counts: (1) possession of an unregistered destructive device (dynamite); (2) failure to pay the tax on the device. See 26 U.S.C.A. § 5861(c) and (d) and § 5871. The incident leading to the arrest and conviction occurred during a strike of the Amalgamated Meat Cutters Union at the Spencer Food Plant at Spencer, Iowa. An explosion took place at the plant at approximately 1:30 a. m. on the morning of June 29, 1971. The defendant was identified by one of the plant guards as being at the site of the explosion immediately before it occurred. The defendant attacks his conviction on the grounds (1) that the evidence was insufficient by reason of his improper identification, (2) that prejudicial error arose from the denial of a continuance when defendant was unable on short notice to obtain an expert witness, (3) that error resulted in denying defendant a new trial after critical expert testimony evidence was later discovered by the defendant, and (4) that the government unduly prejudiced the defendant by calling two witnesses when it was aware that both planned to assert the privilege against self-incrimination. We reverse and remand for a new trial on this last ground.

The evidence surrounding the identification of the defendant is borderline. A security guard, David Hill, on duty the morning of the explosion stated he saw a 1957 Ford pass his guard post and back into the corner of the plant building. He heard commotions and a car door slam. Over an hour later a 1964 Ford convertible drove up with its lights out pausing several minutes in the same area. Then the 1957 Ford came back, made a complete pass of the building and eventually stopped close enough for someone to step out from the corner of the building. The guard testified he then observed, "a tall man wearing a hunting coat, striped, wool or cotton, heavy material; blue jeans, dark pair of shoes. He had black hair, sideburns."

The man came from the shadows, took three steps and entered the right back door of the car.[1] "[He] stepped into the back seat of the car and the driver —all I could get, two in the front, and one had a pair of glasses on, and after the guy got in the back seat of the car they sped off in front of my guard post, looked like they was going to come right at me." Five or ten seconds later there was an explosion where the car had stopped. The witness later identified the same car parked behind a tavern.

On the morning of the bombing Treasury agents and Spencer police showed the guard a number of photographs of strikers taken at various times at the plant. From these photographs he tentatively picked out a picture of the defendant King. On July 1, Hill was taken by the police to the picket line at Spencer Food. Agents awakened an occupant of a car near the line and spoke with him. Hill identified him as the man he saw at the plant the night of the bombing, the defendant Loren King. The police showed Hill more pictures. He was then taken to a parts shop where King worked. In the presence of the agents Hill again identified King as he left the building.

Hill testified at a preliminary hearing in which the defendant informs us the magistrate originally dismissed the charges. At trial on cross-examination, his testimony at the preliminary hearing was brought up. There he admitted that there was originally some question as to his identification from the photographs since "the picture was a little blurry." He stated at trial he became "sure enough to say yes" on King's identification when the Treasury agent talked to King in the car. However, at the preliminary hearing he felt it was not until he saw King leaving Parts, Inc. that the identification jelled.

Defendant sought by written motion to suppress the identification evidence. This motion was argued but no apparent ruling was made on it before trial commenced. During Hill's testimony there was no objection or motion to strike any of his presentation. We find no suggestive prejudice from Hill's tentative pre-arrest identification made from the photographs. Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); and see United States ex rel. Reed v. Anderson, 461 F.2d 739 (3 Cir., 1972). This court has not been previously confronted with the issue of propriety of one-to-one confrontations to confirm identity on a pre-arrest basis. At best such confrontations are fraught with suspicion and may easily lead to misidentification. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). The District of Columbia Circuit Court of Appeals seems to have laid down the most stringent rules relating to one-to-one pre-arrest confrontations to confirm identity. See United States v. Greene, 139 U.S.App.D.C. 9, 429 F.2d 193 (1970). Circuit Judge, now Chief Justice, Burger observed in Bates v. United States, 132 U.S.App.D.C. 36, 405 F.2d 1104, 1106 (1968):

"Prudent police work would confine these on-the-spot identifications to situations in which possible doubts as to identification needed to be resolved promptly; absent such need the conventional line-up viewing is the appropriate procedure."

---

1. As to the lighting, Hill was questioned and testified as follows:

"Q. What is your source of light?

"A. Source of light? On the building and behind me, and if I had that light that was knocked out that would have been my source of light.

"Q. If you had the light that was knocked out?

"A. Yes.

"Q. But it was 'knocked out?

"A. It was knocked out.

"Q. There weren't any lights that night?

"A. Not at that part.

"Q. In other words, you are telling this jury that you made that identification based on light from this light and from these lights that were coming toward you?

"A. That is right."

But cf. United States v. Callahan, 439 F.2d 852 (2 Cir. 1971), cert. denied, 404 U.S. 826, 92 S.Ct. 56, 30 L.Ed.2d 54.

Under the circumstances of the record existing here we cannot say that the evidence which was admitted was insufficient to make a submissible case for the jury. In saying this, however, we do not pass on the overall propriety of the identification procedures used by the police or whether the face-to-face confrontations were properly admitted to bolster the government's case or whether the identification was independently reached notwithstanding these procedures. No objection was made to the testimony when it was offered nor was the trial court requested to specifically rule on the pretrial motion to suppress this identification evidence. We can only assume, if the case is retried, that the matter will be fully developed with attendant specific objections and rulings. Should a conviction ensue we trust the issue will be more adequately presented to us for decision.

■■■ We go directly to the issue requiring reversal. Defendant urges that the government deliberately called two witnesses, who were fellow union members, knowing that both would assert their privileges against self-incrimination. The defendant claims the only apparent purpose the government had in calling the witnesses was allegedly to arouse a prejudicial atmosphere. We have no window through which to perceive fully the government's strategy here. However, based on the record before us and viewing it as objectively as possible, we must agree with the defendant's contention. Prior to the government calling the witnesses their attorney told both government and defense counsel that they would take the Fifth Amendment if called to testify concerning their activities on the evening of the bombing. His warning was repeated each morning of the trial. When the witnesses were called the defendant, according to his motion for new trial, directed the court's attention to the highly prejudicial nature of such tactics but without success.[2] The government's motives must also be viewed disapprovingly in light of its persistence in questioning these witnesses once it knew of their intentions not to testify, and particularly in asking questions which would be certain to elicit the privilege against self-incrimination. This was no minor lapse of judgment.[3]

2. The printed appendix is silent on this matter. Yet the transcript shows an off-the-record discussion held at the bench. We think it imperative that such important objections and rulings be on the record. The reason we recognize the objection here is that it is stated in the motion for new trial that it was made and this is not denied by the government. Even without objection, we find the prejudice involved to be so great that the government's tactics constitute plain error.

3. As to the witness, Christenson, the government asked him the following:
   "Q. Now, did you own a 1957 Ford four-door sedan during the month of June and July of this year?
   "A. I respectfully decline to answer that, sir, on the grounds it might tend to criminate me.
   "Q. It is my understanding no matter what other questions I may ask you that you are not going to answer them. Is that correct? So I don't waste the Court's time. Any questions I am going to ask you about this automobile that you own—that I have asked you whether or not you own it or not, you are going to give no testimony? Is that correct?
   "A. I respectfully decline to answer that on the grounds it might tend to criminate me.
   "Q. I will ask you this one further question: On the night of June 28th, or June 29th were you with Mr. Loren Lee King?
   "A. I respectfully decline to answer that on the grounds it might tend to criminate me.

   .    .    .    .    .

   "Q. Why did you go down to the police department?
   "A. To find out why they had picked up Mr. King.
   "Q. Well, would you indicate to us what was your interest at that particur [sic] point? Why were you interested in if they had picked up Mr. King?

There have been several cases in our circuit where a similar ground for error has been rejected. United States v. McKuin, 434 F.2d 391 (8 Cir. 1970), cert. denied, 401 U.S. 911, 91 S. Ct. 875, 27 L.Ed.2d 810 (1971); United States v. Brickey, 426 F.2d 680 (8 Cir. 1970), cert. denied, 400 U.S. 828, 91 S. Ct. 55, 27 L.Ed.2d 57; Edwards v. United States, 361 F.2d 732 (8 Cir. 1966). None of these cases approach the facts and circumstances presented here. Here the evidence supporting conviction is not strong. No useful government purpose was served by calling these witnesses other than in forcing them to take the privilege in a manner obviously prejudicial to the defendant. As Professor Wigmore has said: "The layman's natural first suggestion would probably be that the resort to privilege in each instance is a clear confession of crime." 8 Wigmore on Evidence, § 2272, p. 426 (McNaughton rev. 1961). In the instant case when the witnesses refused to answer whether they were with King on the night of the bombing, the obvious direct effect was, "Yes, I was and if I would tell you about it it would incriminate me." This is as strong as pointing a finger at King and saying he did it. Yet the defendant King is helpless to cross-examine. Each case must be judged on its own facts but there can be little doubt of the prejudicial atmosphere created here.[4] Namet v. United States, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963); United States ex rel. Fournier v. Pinto, 408 F. 2d 539 (3 Cir. 1969); San Fratello v. United States, 340 F.2d 560 (5 Cir. 1965); Fletcher v. United States, 118 U.S.App.D.C. 137, 332 F.2d 724 (1964); United States v. Maloney, 262 F.2d 535 (2 Cir. 1959); cf. Douglas v. Alabama, 380 U.S. 415, 419, 85 S.Ct. 1074, 13 L. Ed.2d 934 (1965); United States v. Forte, No. 71–1721 (8 Cir. May 17, 1972).

Judgment reversed and remanded for a new trial.[5]

---

*Was the reason that you were with him on the night of the 28th, and the morning of the 29th of June?*

"A. *I respectively decline to answer that on the grounds it might tend to criminate me."* (Emphasis ours.)
No other relevant questions were asked of this witness.

The other witness was one Kruckman. The security guard, David Hill, had already testified that he was the man driving the Ford convertible the night of the bombing. Kruckman was asked questions concerning the vehicles observed by Hill and refused to answer by exercising the privilege against self-incrimination.

4. The trial court submitted a cautionary instruction to the jury to the effect that the taking of the Fifth Amendment by government witnesses should not in any way prejudice the defendant nor should any inference of his guilt arise therefrom. We do not consider this sufficient protection to overcome the prejudicial harm created by the government in purposefully injecting into the trial this problem in the first place. Robbins v. Small, III, 371 F.2d 793 (1 Cir. 1967), cert. denied 386 U.S. 1033, 87 S.Ct. 1483, 18 L.Ed. 2d 594. See United States v. Maloney, 262 F.2d 535, 538 (2 Cir. 1959), where the court noted, "As *res integra*, it is doubtful whether such admonitions are not as likely to prejudice the interest of the accused as to help them, imposing, as they do, upon the jury a task beyond their powers: i. e. a bit of 'mental gymnastics,' as Wigmore § 2272 calls it, which it is for practical purposes absurd to expect of them." This court in Edwards v. United States, 361 F.2d 732, 735 (8 Cir. 1966) has referred to such a cautionary instruction as a "ritual."

5. The government possessed the results of its "swabbing tests" taken from defendant's hands for traces of dynamite some three months before trial. It saw fit to release those results to defense counsel on the day prior to trial. We think it inexcusable that this information was withheld from the defense until the penultimate hour. After defendant was convicted, his counsel located a chemist in Pennsylvania who had practical experience in the field. His statements indicated that the government's test, taken nine days after the explosion, was unreliable, and in fact it was not possible for dynamite substances to remain on defendant's hands until he was tested by the government. The trial of a civil case is no longer a game of surprises. Cf. Nutt v. Black Hills Stage Lines, Inc., 452 F.2d 480 (8 Cir. 1971). There is even greater

reason for fair disclosure in a criminal trial. Barring instances where disclosure would result in a witness' life being in jeopardy (cf. United States v. Cole, 449 F.2d 194 (8 Cir. 1971)) there is no reason for withholding vital incriminating information from the defense. The court appropriately ordered such disclosure in ample time for the defendant to act. The government's delay in complying with the order was in effect no compliance at all. In view of our ruling requiring a new trial, we need not discuss whether the failure to grant a short continuance in light of the lateness of the production of the government report was prejudicial error. We offer these comments to avoid a recurrence in future cases.