COMMONWEALTH *vs.* CARL R. CHASE.

Plymouth.    December 6, 1976. — June 10, 1977.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN,
& WILKINS, JJ.

*Identification.    Evidence,* Judicial discretion, Collateral matter, Disclosure of evidence, Prior conviction, Polygraphic test.    *Constitutional Law,* Self-incrimination, Due process of law.    *Witness,* Impeachment.    *Homicide.*

At a murder trial, there was no error in the denial of the defendant's motion to suppress a photographic identification by a witness who identified him from a set of fifteen photographs. [740-741]
At a murder trial, there was no error in the denial of the defendant's motion to suppress a pre-arrest identification of him by a witness who was taken by police to a bar where the defendant was employed and identified the defendant from among twenty-five patrons and two bartenders. [741-745]
Where a defendant failed to show that a witness's out-of-court identifications of him were improper, there was no error in the denial of the defendant's motion to suppress his in-court identification. [745-746]
At a murder trial, the judge did not abuse his discretion in excluding extrinsic evidence on a collateral matter. [746-748]
Where the prosecutor in a criminal case did not know of certain inculpatory evidence at the time he answered the defendant's motion for

disclosure of such evidence, there was no fundamental unfairness in admitting the evidence at the trial. [748]

A criminal defendant's asserted reluctance to testify, because of the likely adverse effect of his impeachment through the operation of G. L. c. 233, § 21, by evidence of a prior conviction did not raise a valid constitutional question. [749-751]

A judge did not abuse his discretion in denying a criminal defendant's motion that the prosecution produce results of a polygraph test given to an alibi witness who died before the trial. [751-752]

Evidence at a murder trial warranted a finding that the defendant was guilty of murder in the first degree. [752]

INDICTMENT filed and returned in the Superior Court on June 1, 1973.

The case was tried before *Travers,* J.

*Robert W. Kelley (Kevin J. Reddington* with him) for the defendant.

*Helen M. Doona,* Assistant District Attorney, for the Commonwealth.

WILKINS, J.    The defendant appeals from his conviction of murder in the first degree. He raises numerous issues which can be grouped into three general categories: the denial of his motion to suppress out-of-court and in-court identifications by one Walter Sylvia, Jr., rulings on other evidentiary issues, and various nonevidentiary questions, including an argument that he should be granted a new trial by order of this court pursuant to G. L. c. 278, § 33E. We have considered all of these arguments and conclude that the verdict of guilty of murder in the first degree should stand.

Although specific facts will be set forth as necessary for consideration of particular issues, the general circumstances of the victim's death and the defendant's alleged involvement in that death should be set forth first. As to these general circumstances, there is no substantial discrepancy between the evidence heard on the defendant's motion to suppress and the evidence introduced at the trial. The judge made detailed findings on the defendant's motion to suppress and supported his conclusions with a carefully prepared memorandum explaining the reasons for his decision on each element of the defendant's mo-

tion. The defendant has not challenged the judge's subsidiary findings as unwarranted by the evidence. Our summary of the evidence concerning the discovery of the victim's body and the defendant's possible presence at the site of the discovery is based on the judge's memorandum of facts.[1]

On March 14, 1973, at approximately 4:20 A.M.,[2] one Walter Sylvia, Jr., a part-time police officer who was employed regularly as a truck driver, was traveling south on Route 3 in Plymouth. He was driving a tractor-trailer truck containing United States mail. The trailer had sides of aluminum and a legend "U.S. Mail." The tractor was red and had a white sign indicating Grant Rental as its owner. Its high beams were on. When he was fifty to seventy-five feet beyond the Jordan Road Bridge overpass, Sylvia observed certain things on the right hand side of the road, approximately 250 yards southerly of the overpass. He saw a large, light-colored sedan situated either entirely or almost entirely off the traveled way. The automobile was possibly a Cadillac or a Lincoln of a 1966 or 1967 model design, with a black top, possibly vinyl. The headlights of the vehicle were on, the passenger door was open, and the inside passenger compartment light was on. He observed a man standing in front of the right front headlight and looking down. He also saw a brownish, glossy object by the right front door but he could not otherwise identify it. The man was middle aged, had "slumped" shoulders, was wearing a light coat, and perhaps had a cap on his head. He saw only a profile of the face. Sylvia was traveling about fifty miles an hour on a slight upgrade which slowed the vehicle slightly. He observed the man and the vehicle for approximately ten seconds. He first saw the profile of the man when he was

---

[1] That memorandum and the judge's memorandum of decision were not printed in the record or otherwise offered to us. They should have been included in the record. We have obtained a copy of these memoranda from the clerk's office.

[2] At the trial Sylvia testified that he made his observations at 4:10 A.M.

about 100 feet from him and continued to observe him in the rear view mirror after he passed the vehicle. He saw the man only from the waist up. Sylvia had been driving on Route 3 almost nightly for about two and one-half years. He did not stop but continued to his next scheduled stop at Buzzards Bay.[3] The judge found expressly that "[t]here was apparently something about what he had observed on the road ... which caused him to not only take note of it but to feel some special concern and interest in it."[4]

About twenty-five minutes after Sylvia drove by the man and automobile south of the Jordan Road Bridge overpass, Robert D. Sampson, Jr., a messenger for a New Bedford company, passed the same location on Route 3 in Plymouth, while traveling south in a yellow-gold Dodge station wagon. He saw something brownish and white on the shoulder of the road which he thought might be the carcass of a deer. He stopped and backed up. He observed a partially clothed woman who appeared to be badly injured. Using a radio telephone, he sent a message to the Plymouth police station through a Hyannis mobile operator. The message was received at the Plymouth police station at 4:50 A.M. Sampson took his flashlight and went to the aid of the woman. He testified that, while he was with the woman, a Grant Rental tractor-trailer mail carrier drove by, decelerating but traveling at sixty to seventy miles an hour. The cab was red; the trailer body was silver. He helped the woman to his car. The police arrived shortly thereafter.

The Plymouth police took the woman to the Jordan Hospital in Plymouth where she died shortly thereafter of the effects of multiple "blunt force injuries." She did not identify her assailant. There was evidence that the

---

[3] There was evidence at the trial from business records that Sylvia arrived at Buzzards Bay at 4:30 A.M. on March 14, 1973.

[4] The next night Sylvia read of the death of a woman who had been found on Route 3 in Plymouth in the early morning of March 14, 1973. He reported his observations to a Plymouth police officer.

defendant owned a white 1966 Cadillac with a black top. On March 14, 1973, Sampson had a beard; the person Sylvia saw did not.

Subsequently the investigation established who the victim was and that she had lived with the defendant. Attention, therefore, focused on the defendant. He was interrogated on March 20, 1973, at his residence and at a Boston police station, but he was not arrested. The police knew that he retained an attorney on March 20.

### The Motion to Suppress Identification Evidence.

1. We find no error in the judge's denial of the defendant's motion to suppress Sylvia's photographic identification of the defendant. We summarize briefly the judge's findings and conclusions concerning the photographic identification.

On March 25, 1973, a State police officer visited Sylvia at his home. He brought fifteen sets of photographs with him, one set of which showed the defendant. This officer had no information about any statements previously made by Sylvia and had no information about the defendant. All the photographs were of the "mug-shot" variety, containing both a front view and a profile view of the subject. The photographs were of a random group; no one person depicted closely resembled any other. There was nothing particularly distinctive about the pictures of the defendant, although the pictures of the defendant had somewhat less contrast between black and white than the others. Sylvia looked at the photographs for a period of ten to fifteen minutes. The officer made no gestures or comments concerning any set of photographs. Sylvia selected the photographs of the defendant as photographs of the man he had observed on Route 3 in the early morning of March 14.

The judge ruled correctly that the identification was not so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification. See *Neil* v. *Biggers,* 409 U.S. 188, 198 (1972). The judge made an appropriate

analysis of the "totality of the circumstances" surrounding the identification (see *Commonwealth* v. *Botelho,* 369 Mass. 860, 867 [1976]), and found "that there was no such suggestiveness as would violate due process." His conclusion was plainly warranted and fully supported by his findings.

2. The defendant argues next that the judge erred in failing to suppress Sylvia's pre-arrest identification of the defendant while the defendant was working as a bartender at the Back Bay Lounge (lounge), a bar on Massachusetts Avenue in Boston.[5] The defendant's basic argument is that the in-person identification was essentially equivalent to a one-to-one confrontation. The defendant relies on cases which involved impermissible confrontations in police stations. *Commonwealth* v. *Kazonis,* 356 Mass. 649, 651 (1970). *Commonwealth* v. *Guillory,* 356 Mass. 591, 592-593 (1970). He cites no supporting authority concerning the pre-arrest identification of a suspect from a group of people in a public place.

We summarize the judge's findings concerning the identification of the defendant in the lounge. On the evening of April 6, 1973, just over three weeks after the commission of the crime, two State police officers, Lieutenant Masuret and Officer Tobin, met Sylvia in Boston by arrangement and drove him to the lounge. Officer Tobin told Sylvia that he was going there for the purposes of identification. They had no other conversation concerning the object of the trip nor any conversation relating to the case under investigation. Sylvia and Officer Tobin entered the lounge. There were approximately twenty-five patrons in the lounge and at least two bartenders, one of whom was the defendant. The light conditions were fair to good. While standing just inside the door as he entered, Sylvia observed all the people in the lounge and, from approx-

---

[5] In light of our conclusion concerning Sylvia's photographic identification of the defendant, the in-person identification of the defendant at the lounge was not tainted by a prior improper identification procedure.

imately twenty feet away, he recognized a man behind the bar, the defendant, as the man he had seen on Route 3. He did not tell Officer Tobin at that time. Sylvia and Officer Tobin sat at the bar and each ordered a beer which was served by the defendant. The defendant continued to work behind the bar. After five or ten minutes Officer Tobin asked Sylvia if he recognized anyone. Sylvia said that he recognized a man behind the bar, the defendant, as the man he saw on Route 3. At no time had Officer Tobin directed Sylvia's attention to the defendant. He was shown no photograph of the defendant at any time on April 6. The defendant was arrested the next day.

It is important to assess what is not involved in the defendant's argument. He makes no claim that the police used this identification procedure to avoid constitutional protections which a formal lineup procedure would have afforded him. A different question would be presented if it were shown that the police had probable cause to arrest the defendant and elected to pursue an informal identification procedure for the purpose of avoiding a lineup conducted in accordance with constitutional requirements. Perhaps the police had sufficient information on April 6 to justify the arrest of the defendant, although the matter was still in the investigative stage (see *Commonwealth* v. *Bumpus*, 362 Mass. 672, 674-677 [1972], judgment vacated and remanded on other grounds, 411 U.S. 945 [1973], aff'd on rehearing, 365 Mass. 66 [1974]), but, because Sylvia's initial observation of the defendant was made under less than ideal circumstances, the desirability of in-person identification was apparent. Of course, if, as the trial judge concluded, the police did not have authority to require the defendant to participate in a lineup, perhaps they could not have arranged a lineup unless the defendant volunteered to appear. See *United States* v. *Greene*, 429 F.2d 193, 197 (D.C. Cir. 1970). But see *In re Melvin*, 550 F.2d 674 (1st Cir. 1977) (grand jury has power to order a suspect to participate in a lineup); *Sanchell* v. *Parratt*, 530 F.2d 286, 294 n.6 (8th Cir. 1976); *Wise* v. *Murphy*, 275 A.2d 205, 211-216 (D.C. Ct. App. 1971); Model Code of

Pre-Arraignment Procedure § 170.2 (1975). If informal identification procedures of the character involved in this case are not permissible constitutionally, and if there is no constitutionally acceptable method of obtaining a suspect's presence at a formal identification procedure, effective criminal investigations could be thwarted. However, in the case before us we are not asked to determine that in the circumstances the use of an informal identification procedure was impermissible. The sole argument is that the particular procedure followed by the police "was so impermissibly suggestive and prejudicial as to lend itself to misidentification of the defendant."

We accept, of course, the premise of the defendant's argument that due process considerations are applicable to identification procedures conducted even prior to arrest. See *Stovall* v. *Denno,* 388 U.S. 293, 302 (1967); *United States* v. *Wade,* 388 U.S. 218, 227 (1967). However, it is established that a suspect is not entitled to counsel at a pre-arrest informal identification procedure. *Kirby* v. *Illinois,* 406 U.S. 682, 690 (1972). Indeed, in a procedure such as was conducted here, the involvement of counsel makes no practical sense. See *United States* v. *Callahan,* 439 F.2d 852, 864-865 (2d Cir.), cert. denied, 404 U.S. 826 (1971). Similarly, the suspect need not be advised that the informal procedure is being conducted, and it may even be to his advantage that he not be so advised. *Id.* at 865. We recognize, however, that one-to-one confrontations are particularly suspect and should be avoided in the absence of a need for prompt identification. *Stovall* v. *Denno, supra* at 298. *United States* v. *Wade, supra* at 228-229. *United States* v. *King,* 461 F.2d 53, 55 (8th Cir. 1972). *Bates* v. *United States,* 405 F.2d 1104, 1106 (D.C. Cir. 1968).

Informal pre-arrest identification procedures, conducted in nonemergency situations well after the commission of the crime and not involving just the witness and the defendant, have been sustained as constitutionally acceptable in particular circumstances. See Model Code of Pre-Arraignment Procedure § 160.2, Commentary at 438

(1975).[6] The Second Circuit Court of Appeals has said that "after the commission of a crime, in addition to the use of photographs, as permitted by *Simmons,* we can find nothing in *Wade, Gilbert, Stovall* or any other court decision ... preventing law enforcement officers from putting witnesses in a position to see or photograph a suspect in the neighborhood of his home, or at his work, playing golf or doing anything else in a public place." *United States* v. *Callahan, supra* at 865. We do not say, however, that a pre-arrest confrontation, even in a public place, need not be analyzed to determine whether in the circumstances the procedure was so suggestive as to constitute a denial of due process. We turn then to an analysis of the facts of the informal identification conducted in this case.

The identification procedure involved here was not a one-to-one confrontation. There were more than twenty-five people in the lounge. Sylvia looked at everyone in the lounge when he entered and immediately identified the defendant. It is true that the defendant's role in the lounge gave him and the other bartender some greater prominence, particularly when the defendant actually served beer to Sylvia and Officer Tobin. However, Sylvia had already identified the defendant before he sat at the bar. The police made no suggestion to Sylvia concerning identification of the defendant. If Sylvia was to be given the opportunity of identifying the defendant in any public

---

[6] The Commentary states in part: "Informal identifications where a witness is taken to observe a suspect who is not in custody have been generally upheld against due process objections. *E.g., Bratten* v. *State,* 307 F. Supp. 643 (D. Del. 1969) (viewing of suspect in group of four outside motel office); *People* v. *Cesary,* 44 Ill. 2d 180, 255 N.E.2d 1 (1969) (viewing of suspect from group of fifty to sixty); *United States ex rel. Clemmer* v. *Mazurkiewicz,* 365 F. Supp. 1158 (E.D. Pa. 1973) (viewing suspect at work among crew of six or seven)." We note that the *Bratten* case involved an identification procedure which occurred only five hours after the crime was committed.

One-to-one confrontations immediately after the commission of a crime or in exigent circumstances often have special justification. *Commonwealth* v. *Barnett,* 371 Mass. 87, 91-92 (1976), cert. denied, 429 U.S. 1049 (1977).

place, it is difficult to imagine a less suggestive situation in which it could have been done.

The judge was warranted in concluding that the defendant had not established that the identification procedure in the lounge was unnecessarily suggestive. The burden clearly is on the defendant to show the procedure was constitutionally invalid. See *Commonwealth* v. *Botelho,* 369 Mass. 860, 867 (1976). Here to reverse the judge's finding we would have to conclude that a pre-trial identification of a person in a group of people such as occurred in these circumstances always must be suppressed. We decline to accept that result as constitutionally compelled. The question is not whether the jury should have believed Sylvia's identification of the defendant, but whether it was fundamentally unfair to permit the jury to hear evidence of Sylvia's identification of the defendant at the lounge. We think that the judge was warranted in concluding that it was not.[7]

3. The defendant's challenge to Sylvia's in-court identification of him must fail because the pre-trial identification procedures were not constitutionally defective. As a result, we need not consider whether the in-court identification was adequately based on observations of the defendant independent from any improper pre-trial identification procedure. *Commonwealth* v. *Kostka,* 370 Mass. 516, 524 (1976). The judge did not consider, and had no need to consider, whether the Commonwealth showed by clear and convincing evidence that the in-court identification would be based on Sylvia's original observation of the defendant

---

[7] The judge made certain additional findings which support his conclusion that the out-of-court identification was admissible. These findings deal with elements which would be relevant in determining whether evidence of an unnecessarily suggestive confrontation is nevertheless admissible. See *Commonwealth* v. *Botelho,* 367 Mass. 860, 867 & n.5 (1976). For example, the judge found that the defendant's appearance was consistent with the "highly detailed description" which Sylvia gave of the person he had seen beside the highway. He also noted that Sylvia gave a description of the automobile he saw which was "in general quite a close description of the vehicle owned by the Defendant, at that time."

on Route 3. See *Commonwealth* v. *Mobley*, 369 Mass. 892, 897 (1976); *Commonwealth* v. *Botelho*, 369 Mass. 860, 867-868 (1976); *United States* v. *Wade*, 388 U.S. 218, 240 (1967).

### OTHER EVIDENTIARY RULINGS.

4. The defendant argues most strenuously that he was denied a fair trial because the judge barred him from cross-examining witnesses and from offering impeaching evidence in a crucial aspect of his defense. As can be seen from an analysis of the basic evidence offered against the defendant, the time at which Sylvia drove by the place where the victim was found was crucial. If Sylvia drove by that place at 4:10 A.M., as he testified, he would not have seen Sampson, the man who found the victim. On the other hand, if he drove by later, such as at 4:40 A.M., the person whom he saw beside the highway might have been Sampson. The possibility that Sampson was the person beside the highway was strengthened by Sampson's testimony that a Grant Rental mail truck, apparently similar to the one driven by Sylvia, passed by while he was with the victim.

On March 20, 1973, Lieutenant Masuret of the State police filed an affidavit in the Municipal Court of the City of Boston in support of a request for a warrant to search the defendant's automobile at his residence in Boston. In that affidavit Lieutenant Masuret swore that on March 14, 1973, Sylvia called the Plymouth police department, spoke with Sergeant Mansfield, and told him "that he was driving his truck southbound on rte 3 and *at approximately 4:40 AM* he observed a 1966 or 1967 car color white with a black top parked alongside the road" (emphasis supplied). Sylvia testified that he had never made any statement to Sergeant Mansfield and that he did not tell Lieutenant Masuret that he went by the site at 4:40 A.M. Sergeant Mansfield testified that he had not talked with Sylvia at any time.

The defendant made numerous unsuccessful attempts to determine from Lieutenant Masuret and Sergeant Mans-

field what may have been said between them concerning the time of Sylvia's observation. The judge excluded this evidence. The defendant argues that he was denied due process of law because he was not permitted properly to confront the witnesses against him. The defendant's basic argument is that he was entitled to offer evidence of prior inconsistent statements for the purpose of impeachment.

Evidence about what Sergeant Mansfield may have said to Lieutenant Masuret concerning 4:40 A.M. was properly excluded in the judge's discretion. The conversation, if any, between the police officers concerning the time Sylvia drove by the site in Plymouth was collateral to the issues in the case.

Extrinsic evidence on a collateral matter may be introduced at trial for the purposes of impeachment only in the discretion of the judge. *Commonwealth* v. *Doherty*, 353 Mass. 197, 213-214 (1967), cert. denied, 390 U.S. 982 (1968). *Commonwealth* v. *Connolly*, 308 Mass. 481, 495 (1941). See 3A J. Wigmore, Evidence § 1003 (Chadbourn rev. 1970); W.B. Leach & P.J. Liacos, Massachusetts Evidence 113 (4th ed. 1967). What Sergeant Mansfield may have said, if anything, to Lieutenant Masuret about the time Sylvia said he saw a man beside the highway could have no bearing on any fact relevant to any issue in the case and was inadmissible to prove that Sylvia drove by the site at a later time. That evidence could not represent a prior inconsistent statement of Sylvia, the identifying witness. It was not evidence which was otherwise admissible in the case. At most it would have shown a prior inconsistent statement of Sergeant Mansfield. Sergeant Mansfield had denied that he had ever spoken with Sylvia, and Sylvia had denied having spoken to Sergeant Mansfield. This case, therefore, does not involve the exclusion of a prior inconsistent statement of a witness on a material issue in the trial. See *Hathaway* v. *Crocker*, 7 Met. 262, 265-266 (1843). If it did involve such a situation, a refusal to permit reasonable confrontation or impeachment of the witness with prior inconsistent statements might involve an abuse of discretion or even a denial of constitu-

tional rights. See *Commonwealth* v. *Franklin*, 366 Mass. 284, 289-291 (1974); *Davis* v. *Alaska*, 415 U.S. 308, 316-318 (1974).

5. The defendant argues in due process terms that he was denied a fair trial because the judge permitted the prosecution to introduce evidence that six days after the victim's death one of the defendant's hands was swollen. The argument is based on the fact that, although a motion for the disclosure of inculpatory evidence had been allowed, the prosecution did not advise defense counsel of that evidence. The judge found that the prosecution did not know of the swollen hand at the time it answered the defendant's motion but that, pursuant to a continuing duty, the prosecution subsequently made an oral disclosure of the evidence. Thus, there was no concealment. In these circumstances, there was no fundamental unfairness in admitting the evidence.

6. There was no error in various other evidentiary rulings made by the judge. Several exceptions to various rulings on evidence are listed by the defendant but not argued except in support of a claim that his trial was unfair. A review of the transcript of this lengthy trial discloses no prejudice of the character claimed. The judge dealt patiently with the presentation of the defendant's case, tolerating extensive and often repetitious questioning by defense counsel. There was no atmosphere of hostility to the defense, as the defendant argues. The judge did not abuse his discretion in denying the defendant's request to recall certain prosecution witnesses for further cross-examination. There was no inhibition against the defendant's calling these witnesses as part of his case. He did call two of them and subjected them to extensive further questioning. Nor was there any abuse of the judge's discretion when he restricted the defendant's inquiry into a telephone conversation which occurred between two sequestered witnesses during the trial. The subject of that telephone conversation between Lieutenant Masuret and Sergeant Mansfield was revealed and shown to have concerned a collateral and inconsequential matter.

### NONEVIDENTIARY ISSUES.

7. The defendant argues that he was denied due process of law because he was inhibited from testifying by reason of the operation of G. L. c. 233, § 21, which allows evidence of certain prior convictions to be introduced to impeach the credibility of a witness. The defendant has appended to his brief his probation record, which is not part of the record in this appeal. That record shows that on December 4, 1952, the defendant was convicted of murder in the State of Maine and sentenced to a life term in the State prison. He was paroled on June 1, 1970. No suggestion is made that evidence of that conviction could not have been introduced to affect the defendant's credibility, if he had taken the stand.

For the first time on appeal, the defendant argues that the statute constituted an unconstitutional prior restraint on his right to a fair trial and denied him due process of law. We think that one who declines to testify because of the threat of the effect of G. L. c. 233, § 21, stands in no stronger position than a criminal defendant who takes the stand and then objects on constitutional grounds to his impeachment by evidence of a prior conviction.

The claim that the operation of G. L. c. 233, § 21 (and statutes like it), denies due process of law to a criminal defendant who is impeached by a prior conviction has been rejected by this court and by the Supreme Court of the United States. *Commonwealth* v. *Boyd,* 367 Mass. 169, 174-175 (1975). *Commonwealth* v. *DiMarzo,* 364 Mass. 669, 678 (1974). *Spencer* v. *Texas,* 385 U.S. 554, 563-564 (1967). Some crimes affect one's credibility more than others, and the judge may advise the jury of that fact provided he specifically informs them that "they are the ultimate arbiters of credibility, and that it is for them to decide whether, and to what extent, a crime may affect credibility." *Commonwealth* v. *Bumpus,* 362 Mass. 672, 683 (1972), judgment vacated and remanded on other grounds, 411 U.S. 945 (1973), aff'd on rehearing, 365 Mass. 66 (1974). When it is offered for the purposes of impeach-

ing a witness, the judge has no statutory discretion, however, to exclude evidence of a prior conviction which meets the conditions of G. L. c. 233, § 21. *Commonwealth* v. *West,* 357 Mass. 245, 248-249 (1970). Cf. Fed. R. Evid. 609 (a). The defendant's only recourse for protection against any possible prejudice is to request careful limiting instructions to the jury, including a request that the judge instruct the jury that the evidence does not go to the defendant's guilt but only to his credibility. See *Commonwealth* v. *Boyd, supra* at 174. We have recognized that a prior conviction of a crime of a substantially different character from the crime with which the defendant is charged is less prejudicial than when the two crimes are of much the same nature. *Commonwealth* v. *Sheeran,* 370 Mass. 82, 88 (1976).

There remains, however, a lingering sense that in particular instances a defendant may be treated unfairly, when evidence is admitted of a defendant's prior conviction of a similar crime, particularly a crime not reflecting previous untruthfulness. See *Commonwealth* v. *DiMarzo,* 364 Mass. 669, 680-682 (1974) (Hennessey, J., concurring). Cf. *Walter* v. *Bonito,* 367 Mass. 117, 123-124 (1975). Although, as we have said, the statute does not give the judge any discretion to exclude the evidence when the prosecutor in his discretion offers it, we would not deny the right of a judge to avoid any question of unfairness by excluding such evidence in a situation where the likely prejudice to the defendant is most intense. Such a case would arise most commonly where the evidence of a prior conviction of the defendant (as opposed to another witness) is offered, the crime charged and the prior crime are similar, and those crimes do not bear directly on the disposition of the defendant to tell the truth.

In the case before us, the defendant makes no argument that he objected to the application of G. L. c. 233, § 21, to him at the trial level. We find no such indication in the record before us. We do not know, but may reasonably assume, that the prosecution would have sought to impeach the defendant's credibility by introducing evidence of his prior conviction of murder. Nor do we know whether,

in the face of a constitutional challenge, the judge would have permitted that evidence to be admitted. The issue might have been raised, even before trial, by a motion to exclude that evidence but was not, as far as the record reveals.[8]

The issue is not one of constitutional dimensions in the form in which it is raised here. In any event, a defendant's asserted reluctance to testify, because of the likely adverse effect of his impeachment by evidence of his prior conviction, has not commended itself as raising a valid due process challenge in any case cited by the defendant or which has come to our attention. Such a conclusion does not mean, however, that legislative concern with the undesirability of applying the statute in particular instances would be inappropriate. See *Commonwealth* v. *Delorey*, 369 Mass. 323, 331 (1975) (Hennessey, J., concurring).

8. The judge did not abuse his discretion in denying the defendant's motion that the prosecution produce results of a polygraph test which had been given to Leon Kendrick, an uncle of the defendant who died after the crime was committed and before trial.[9] The defendant hoped to support his alibi defense by showing that the polygraph test corroborated exculpatory statements made by Kendrick. Kendrick's extrajudicial statements would not have been admissible under any exception to the hearsay rule, and their admissibility would not have been enhanced because they were made in the course of a polygraph examination. This is not one of those limited circumstances in which, in the judge's discretion and after appropriate findings and a waiver by the defendant, evidence of the results of a polygraph examination could have been admitted. *Commonwealth* v. *A Juvenile (No. 1)*, 370 Mass. 450, 453-454 (1976). *Commonwealth* v. *A Juvenile*, 365 Mass. 421, 430-431 (1974). We have accepted the possi-

---

[8] The defendant's brief does not indicate what he would have testified to, if he had taken the stand.

[9] The judge did allow the defendant's motion for the production of Kendrick's statements to the police, but the defendant made no attempt to introduce any such statement in evidence.

bility of the admission of the results of a polygraph test of a defendant where the defendant agreed in advance that the results would be admissible irrespective of the outcome of the tests. Here there was no advance agreement, and, in any event, Kendrick was not the defendant.

9. The judge properly denied the defendant's motion for a directed verdict which was filed at the close of the Commonwealth's case. The evidence, considered in its light most favorable to the Commonwealth (*Commonwealth* v. *Sandler*, 368 Mass. 729, 740 [1975]), at the conclusion of the Commonwealth's case in chief (*Commonwealth* v. *Kelley*, 370 Mass. 147, 150 (1976), was sufficient to warrant the inference of the essential elements of the crime of murder in the first degree. The jury could have found that the defendant and his automobile were seen by the side of Route 3 on March 14, 1973, where the badly beaten body of the victim was discovered one-half hour later. The defendant admitted that at various times he had hit the victim, who lived with him. There was evidence that the defendant was not in a friendly mood toward the victim on the night of March 13, 1973. Six days after the victim's death the defendant had a swollen hand. Although there was a clear question of fact whether the defendant was the man seen beside Route 3 in Plymouth in the predawn hours of March 14, 1973, that question was for the jury. The motion for a directed verdict properly was denied.

10. Finally, the defendant urges us to exercise our power and duty under G. L. c. 278, § 33E, and direct that he be given a new trial. Clearly, there was a difficult identification issue for the jury to resolve. That factual question was answered against the defendant. None of the substantive issues argued here shows any miscarriage of justice. A finding of murder in the first degree was justified, and entry of a verdict of any lesser degree is not urged by the defendant or justified pursuant to our authority under G. L. c. 278, § 33E.

*Judgment affirmed.*