COMMONWEALTH vs. MARVIN M. SMITH.

Suffolk.  October 15, 1981. — November 30, 1981.

Present: GREANEY, PERRETTA, & KASS, JJ.

*Practice, Criminal*, Required finding, Challenge of jurors. *Identification. Due Process of Law*, Identification. *Jury and Jurors*.

The evidence at a criminal trial was sufficient to warrant a jury's finding that the defendant was an active participant in a joint venture to commit robbery. [668-670]

On a motion to suppress an identification of a criminal defendant, occurring while he was in court as the defendant in an unrelated case, the judge's conclusion that the witness's identification was based solely on a spontaneous reaction triggered by his sudden and coincidental recognition of the defendant, and the judge's implicit finding that the identification was not the result of connivance by police, were adequately supported by the record, and neither a second look by the witness when asked by police to return to the courtroom, nor an order by the judge in that session that the defendant remain in the dock, given after the defendant tried to conceal himself, violated his due process rights. [670-675]

In the circumstances the judge in a criminal trial was not required to disallow the Commonwealth's peremptory challenges of three of the five black prospective jurors on the venire or to declare a mistrial based thereon. [675-676]

INDICTMENTS found and returned in the Superior Court Department on February 12, 1979.

A pretrial motion to suppress evidence was heard by *Flaksman*, J., a District Court judge sitting under statutory authority, and the cases were tried before *Lynch*, J.

*John F. Donovan* for the defendant.

*James M. Lynch*, Assistant District Attorney (*Carol Anne Fagan*, Special Assistant District Attorney, with him) for the Commonwealth.

GREANEY, J.  Following a jury trial, the defendant was convicted of armed robbery while masked (G. L. c. 265,

§ 17) and assault and battery by means of a dangerous weapon (G. L. c. 265, § 15A).[1] On appeal, he argues error in (1) the denial of his motions for required findings of not guilty (Mass.R.Crim.P. 25, 378 Mass. 896 [1979]); (2) the denial of his pretrial motion to suppress his out-of-court identification by an eyewitness; and (3) the failure of the judge to declare a mistrial following the prosecutor's exercise of peremptory challenges to exclude three black jurors from the panel. We affirm the convictions.

1. *The motions for required findings.* About 9:00 A.M. on October 10, 1978, a Stop & Shop market in Jamaica Plain was robbed by three black males, at least two of whom were armed with handguns. In the course of the robbery, the store manager was shot in the back. Smith did not challenge the sufficiency of the evidence to warrant a finding that three armed, masked men participated in a joint venture to rob the store, nor did he challenge the adequacy of the evidence to establish that the store's manager was assaulted with deadly force. Rather, Smith's motion for required findings argued that the Commonwealth had failed to prove that he was one of the robbers.

On that issue, one Martin, a constable of Boston, testified that he was a passenger with two other men in a van which was approaching the store about 9:00 A.M. Martin observed three men running from the store and entering an automobile. One of the men had a bag in one hand and a pistol in the other. This man was black, and his face appeared to be covered by something similar to an orange and black scarf. Martin testified that when the van was about fifteen to twenty feet away from the automobile, he saw the scarf fall from the man's face. The robber, who had been laughing, assumed a "very serious" demeanor upon eye contact with Martin, who thereafter viewed the man's features for about five seconds. A second passenger in the van also observed three black men running from the store. This pas-

---

[1] Smith was acquitted on a charge of assault with intent to commit murder (G. L. c. 265, § 15).

senger stated that one man wore a turtleneck sweater pulled up over his mouth and held a bag in one hand and a pistol in the other. He was unable to identify any of the robbers. The third man in the van was also unable to make any identification. About one month later, Martin saw Smith at the Roxbury District Court and positively identified him as the robber whom he had seen running from the store with the bag and the handgun. There was additional testimony that shortly after the robbery, the police, based on information that the getaway car had been seen nearby, went to an address approximately half a mile from the store. No automobile was found at that location, but the police picked up an orange and brown turtleneck sweater (turned inside out) and a pair of blue jeans. Both items had been discarded on a driveway near the house. Hairs from the neck area of the sweater together with hair samples of other suspects in the robbery (including a sample of Smith's hair) were sent to the F.B.I. crime laboratory in Washington. An expert from that laboratory testified that he analyzed all the samples which had been received from the Boston police, that there are fifteen detectable characteristics in a human hair sample, and that, in his opinion, the hairs found on the orange and brown sweater exactly matched a sample of Smith's hair in all fifteen categories.

Smith argues that several factors undermined the reliability of Martin's identification. He points to the short period of time in which Martin observed the robbers, the fact that his observations were made from a moving vehicle, and the fact that the other two men in the van were unable to make identifications, although they were exposed to the same scene as Martin. Smith also points out that, after the robbery, Martin selected a photograph of one Anthony Seymour as the person he had seen. Smith argues that these circumstances, taken together, compel a finding that Martin's identification was incompetent as a matter of law. In addition, he contends that the absence of evidence directly linking the turtleneck sweater to any person in the car negates the probative value of comparing the hair taken from the

sweater with his own hair. On these grounds, he concludes that he was entitled to required findings of acquittal. We disagree.

To determine whether the charges were properly submitted to the jury, we look to see "whether the evidence, in its light most favorable to the Commonwealth, *notwithstanding the contrary evidence presented by the defendant*, is sufficient . . . to permit the jury to infer the existence of the essential elements of the crime charged" (emphasis supplied). *Commonwealth* v. *Kelley*, 370 Mass. 147, 150 (1976). See e.g., *Commonwealth* v. *Tabor*, 376 Mass. 811, 824 (1978); *Commonwealth* v. *Dunphy*, 377 Mass. 453, 455-456 (1979). Smith's arguments overlook the language emphasized above. On the evidence presented, the jury could well have found that Martin's opportunity to view Smith occurred in circumstances likely to fix Smith's face in his mind, and that Martin's subsequent recognition of Smith in the Roxbury District Court was independently based on his observations at the scene of the crimes. The jury could also reasonably infer that what Martin perceived as an orange and black scarf was actually the neck of an orange and brown turtleneck sweater. Since the getaway car was sighted in the vicinity where the sweater was later found, it could further be inferred that the robber, realizing that he had been seen by an eyewitness, sought to discard the sweater because of its distinctive characteristics. These circumstances provided a connection between the sweater and one of the robbers, and Martin identified that robber as Smith. The identification was further supported by the analysis of the hair samples. We conclude that a rational jury, viewing the direct and circumstantial evidence in its totality, could have found that Smith's active participation in the joint venture had been established beyond a reasonable doubt. *Commonwealth* v. *Latimore*, 378 Mass. 671, 678 (1979). The motions for required findings were therefore properly denied by the trial judge.

2. *The motion to suppress.* We first summarize the findings of fact made by the judge who heard and denied Smith's

motion to suppress the identification made by Martin at the Roxbury District Court. Between October 10 and November 17, 1978, Martin viewed photographs of suspects in the robbery. During this process, he selected a picture of one Anthony Seymour as one of the men involved in the crimes. There was no evidence to show that Martin had mistakenly confused Seymour with Smith or evidence that a picture of Smith had been included in the photographs shown to Martin. Seymour was thereafter arrested and charged. Despite this arrest, the police investigating the case still suspected that Smith had been involved in the commission of the crimes but lacked proof sufficient to charge him. The case proceeded against Seymour. The assistant district attorney advised Seymour's counsel in advance of the probable cause hearing that the hearing would probably be limited to Seymour's identification by Martin. The prosecutor also communicated his belief that the robbery may have been committed by Seymour or by Smith, but not by both men.

On November 17, 1978, with the investigation in this posture, Martin was summoned to the Roxbury District Court to testify at Seymour's probable cause hearing. On that same day, Smith was seated alone in custody in the dock waiting to answer to an unrelated charge of automobile theft. Martin had not been made aware that Smith was to appear in the court on that day, nor did he know that Smith would be in custody in the dock in the second session courtroom. While Martin was waiting for the Seymour case to be called, he entered the courtroom, unexpectedly saw Smith, and recognized him to be one of the participants in the Stop & Shop robbery. Martin immediately left the courtroom and advised a police officer assigned to the Seymour case of what had occurred. This officer instructed Martin to reenter the courtroom to verify his identification. When Martin returned, accompanied by two officers and the assistant district attorney, Smith first attempted to cover his face with his hands and later attempted to conceal himself by hiding behind the wall of the dock. Following Smith's conviction in the unrelated case, the assistant district attor-

ney obtained an order from the District Court judge directing Smith to remain in the dock so that Martin could see him face to face.[2] Counsel for Smith, who was still in the courthouse, was not advised of, or present at, this last exercise.

Based on these findings of fact, the motion judge stated in his written memorandum that Martin had not been advised prior to his arrival at the courthouse that he would be called upon to identify anyone other than Seymour as a participant in the robbery and that Martin's purpose and only expectation on November 17, was to see Seymour. The judge concluded that Martin's identification was based solely on a spontaneous reaction triggered by his sudden and coincidental recognition of Smith.[3]

Smith asks us to divide the identification at the Roxbury District Court into three separate parts: the first, the initial encounter between Martin and Smith; the second, the view resulting from the police advice given Martin to take another look in order to be sure; and the third, the confrontation pursuant to the order obtained from the District Court judge. As to the first, Smith argues that the presence on November 17 of several police officers who were not ostensibly involved in the Seymour matter, taken together with the assistant district attorney's prior suspicions of Smith, requires a conclusion that the police contrived the showup, using the Seymour hearing as a ruse to mask the contrivance. Smith argues further that the second and third meetings

---

[2] The judge in this session could have found that the order was necessary because Smith had attempted to cover his face to avoid Martin and because Smith, while the assistant district attorney was talking to the judge, had crouched down in the dock and attempted to crawl out the door.

[3] In the event that an appellate court should find the identification episode unnecessarily suggestive, the motion judge made separate findings which concluded in substance that Martin's identification had an independent source (*Commonwealth* v. *Botelho*, 369 Mass. 860, 865-868 [1976]) or was otherwise reliable under the standards set by *Manson* v. *Brathwaite*, 432 U.S. 98, 114 (1977). Since we shall hold, *infra*, that the identification can be upheld under an approach which considers elements of suggestiveness, we need not discuss the motion judge's alternative findings.

were unnecessarily suggestive one-on-one confrontations arranged by law enforcement authorities in violation of his constitutional rights.

Even accepting Smith's premise that the identification process is best analyzed in three phases (see note 5, *infra*), we find no error. Smith's contrivance theory is deflated by the judge's implicit finding that Martin's identification was not the result of a police conspiracy, and his explicit finding that it was based solely on Martin's spontaneous reaction to his coincidental recognition of Smith. Supporting that conclusion are Martin's testimony that he had not been told by anyone that other suspects in the robbery might be in the courtroom that day; the testimony of the officer investigating the Seymour case that he first discovered that Smith was a suspect when Martin made his identification; and the testimony of the assistant district attorney that he asked several other police officers to come to the courthouse because the Seymour case provided a convenient opportunity to meet and discuss all aspects of the investigation with the police officers involved. There was no evidence that agents of the Commonwealth arranged to have the Seymour and Smith cases appear on the same list. The first encounter thus comes within the precedents which validate accidental meetings between witness and suspect where the police have made no attempt to elicit an identification. *Commonwealth* v. *D'Ambra*, 357 Mass. 260, 263 (1970). *Commonwealth* v. *Leaster*, 362 Mass. 407, 410 (1972). *Commonwealth* v. *Walker*, 370 Mass. 548, 564-565, cert. denied 429 U.S. 943 (1976). *Commonwealth* v. *Hervey*, 1 Mass. App. Ct. 727, 728-729 (1974). *Commonwealth* v. *Charles*, 4 Mass. App. Ct. 853 (1976). *Commonwealth* v. *Schlieff*, 5 Mass. App. Ct. 665, 670-671 (1977). *Commonwealth* v. *Brimage*, 6 Mass. App. Ct. 869, 870 (1978). *Commonwealth* v. *Harris*, 11 Mass. App. Ct. 165, 175 (1981). These encounters have been held not to raise due process considerations even if the confrontation occurs, as it did here, in a suggestive setting. See *Commonwealth* v. *Barnett*, 371 Mass. 87, 93 n.7 (1976), cert. denied, 429 U.S. 1049 (1977).

The second identification followed immediately. The judge found that the police sought it in order to obtain verification of Martin's fortuitous observations and that Martin was given no other prompting prior to his return to the courtroom. After that view, Martin told the police that he was reasonably "positive" that Smith was one of the men he had observed at the scene of the crimes. We think that this second look at Smith was permissible in the interests of sound police work and not in violation of due process. See *Commonwealth* v. *Cincotta*, 379 Mass. 391, 393, 395 (1979), which found a comparable identification to be "an unfabricated, common scene of witnesses quite naturally and expectedly appearing in a court room, awaiting the call of a probable cause hearing and seeing the defendant, relatively isolated, moments before the call."

The third confrontation, viewed in hindsight, might have been conducted under better protocol. See *Commonwealth* v. *Napolitano*, 378 Mass. 599, 607-608 (1979). The evidence, which the judge appears to have found credible, indicates that its primary goal was to have Smith avoid ducking Martin (see note 2, *supra*) so that the latter could make a face-to-face identification. It may also have been designed to clear up any confusion Martin might have had between Seymour and Smith, to clarify the assistant district attorney's hypothesis that Seymour or Smith, but not both, had committed the robbery, and to provide a basis for charging Smith with participation in the crime.[4] The so called last identification procedure is similar to the procedure followed in a different setting, and approved upon judicial review, in *Commonwealth* v. *Storey*, 378 Mass. 312, 314-315, 318-319 (1979), cert. denied, 446 U.S. 955 (1980). Given the confused events of the day and the addi-

---

[4] The police had received some information about November 1, 1978, that Smith and two other individuals had committed the Stop & Shop robbery. Apparently, they did not consider this information of sufficient reliability to charge Smith. It was only after Martin's identification that Smith was charged.

tional factors set forth in the margin,[5] we think the procedure did not exceed constitutional tolerance. Since the judge's findings are not clearly erroneous (*Commonwealth* v. *Moon*, 380 Mass. 751, 756 [1980]), and since his legal conclusions are sound, we hold that the motion to suppress Martin's identification was properly denied.

3. *Selection of the jury.* The defendant contends that the judge should have declared a mistrial because of the Commonwealth's improper exercise of peremptory challenges. There apparently were five black persons on the venire. The first was challenged by the defense for cause, and the challenge was allowed. Three others were peremptorily challenged by the prosecutor. The last black juror was eventually accepted. The trial judge required the prosecutor to state his basis for each peremptory challenge. See *Commonwealth* v. *Soares*, 377 Mass. 461, 489-491, cert. denied, 444 U.S. 881 (1979); *Commonwealth* v. *Brown*, 11 Mass. App. Ct. 288, 295 (1981). Based on the manner in which the challenges were exercised,[6] and the reasons given,[7] the

---

[5] The motion judge was not asked to break this identification out of the entire episode and subject it to separate constitutional scrutiny. This suggests that counsel below viewed the matter at the time the motion was heard as involving one identification, and not three separate procedures. We also take note of the fact that the government's identification testimony at the trial omitted any reference to this last procedure.

[6] The first two challenges were among a group of six challenges which removed four white jurors as well as the two black jurors. The prosecutor indicated at this juncture that he would not have peremptorily challenged the one black juror who had been challenged for cause by the defense. The third challenge was exercised in the last group of challenges which led to one black juror being accepted for service.

[7] One challenge was exercised because the juror had been challenged twice before in other cases by the assistant district attorney assisting the prosecutor in this case. A second challenge was exercised because the juror had sat on a prior case which the prosecutor's assistant had tried and which had resulted in a "problem" for the Commonwealth. These two challenges were apparently based on the possibility that these jurors might harbor some ill-will towards the Commonwealth and that reason was accepted as bona fide by the judge. The third challenge was exercised to strike a carpenter employed by Harvard University. The prosecutor stated that he felt "with [t]his sort of background [the juror] would not make

judge ruled that the challenges were not racially motivated and that the prosecutor had not sought to purge the jury of a particular group. While defense counsel used his right to object to compel disclosure of the reasons behind the challenges he never moved for a mistrial. The record of the entire jury empanelment satisfies us of the soundness of the judge's conclusion that the challenges were proper. In the circumstances, the judge was not required to disallow the challenges or to declare a mistrial. *Commonwealth* v. *Walker*, 379 Mass. 297, 300 (1979). *Commonwealth* v. *Reid*, 384 Mass. 247, 255-256 (1981). Contrast *Commonwealth* v. *DiMatteo, ante* 547, 551-553 (1981).

*Judgments affirmed.*

a particularly fair Commonwealth juror." The reason why the prosecutor felt these innocuous facts might raise "the spectre of individual bias" (*Commonwealth* v. *Soares*, 377 Mass. at 485) frankly escapes us. The judge might well have demanded a better explanation, see *Commonwealth* v. *DiMatteo, ante* 547, 551-552 (1981), and if one was not forthcoming disallowed the challenge. Nevertheless there is support in the record for the judge's conclusion that the challenges did not reflect "a pattern of conduct . . . whereby several prospective jurors who have been challenged peremptorily . . . are being excluded from the jury solely by reason of their group membership." *Commonwealth* v. *Soares, supra* at 490.