COMMONWEALTH *vs.* ALBERT B. BENSON. December 8, 1983. *Identification.*

Suspicious fires, in two adjacent buildings under common ownership, occurred at 62 and 64 Brunswick Street, in Boston's Roxbury district on January 7 and 10, 1976. On March 13, 1980, Benson was indicted for conspiracy to commit arson. He filed a pretrial motion to suppress identification testimony by Jacob Holland and Woodrow Abercrombie. In April, 1981, a Superior Court judge (the motion judge) denied the motion. With a different Superior court judge presiding, a jury in May, 1982, found Benson guilty. On a related indictment of Benson for conspiracy to defraud an insurance company, a required finding of not guilty was ordered. The issues argued on this appeal (from a suspended sentence of from three to five years at M.C.I., Walpole, and from being placed on probation for five years) relate to the denial of the motion to suppress.

1. *Identification testimony of Jacob Holland.* The motion judge made essentially the following findings concerning Holland, a tenant of the second floor of 64 Brunswick Street. Holland was sixteen years old at the time of the fire in that building on January 7, 1976. On January 6, he saw two men leave a motor vehicle in front of the building and again briefly as they went past his apartment to the third floor. On January 7, about 9:30 P.M., he heard "a sound like an explosion . . . coming from the third floor." From the front door of his apartment, he saw smoke in the hallway. The rear hallway was "dark and smokey." He heard one per-

son descending the rear stairs to the first floor and was able to view the profile of a second person, tall with light hair and wearing jeans, whom he believed to be one of the men he had observed the day before. He took the young people then in his care out of the building.

By the light of fire in the building, Holland observed for twenty minutes at least two white men (noticeable because the area population was "exclusively black") standing about fifty feet from him in an open field nearby. One resembled the man that he had seen going down the back stairs.

On March 27, 1979, Trooper Joseph Flaherty of the Attorney General's office went to Holland's then home with an array of fifteen photographs which included one photograph each of Albert Benson and of his brother Viktor Benson. The array also included persons similar to the persons described by Holland. Holland, told that "he was not compelled to pick out anybody," went through the photographs quickly once and selected no photograph. Trooper Flaherty asked him to take his time, go through them more slowly, and see if he recognized anybody. Holland finally selected two, one of which was a photograph of Albert Benson. About ten months later (January 12, 1980), Trooper Flaherty (with an assistant attorney general) again visited Holland with an array of fifty photographs. Holland chose the same two photographs.

Subsequently on February 2, 1981, Holland in a recorded interview in the office of Benson's counsel stated that a man (not Benson) present in that office resembled the man seen on the back stairs on the night of the fire. Holland failed to recognize Benson, who walked in during the interview. Holland then stated that, after he had selected on March 27, 1979, a photograph (which he learned later to have been of Benson), Trooper Flaherty had commented that Holland had "guessed right" and that at least one of the men shown in the two selected pictures had been involved in the fires. Trooper Flaherty, before the motion judge, denied making such statements. Holland subsequently (April 12, 1981) gave a deposition in which he expressed doubt whether he could then pick out the man he saw on the back stairs on January 7, 1976. At trial, Holland made no in-court identification of Benson.

2. *Identification testimony of Woodrow Abercrombie.* The motion judge made the following findings concerning Abercrombie. The witness has "a good education and is of above average intelligence." He had been "a sort of resident superintendent" (in return for a discount in rent of a third-floor apartment) of the building at 62 Brunswick Street. After an absence from Boston, he returned to 62 Brunswick Street on January 9, 1976, before midnight. When he attempted to enter the door of the building, a man ("about six feet tall with light brown hair, thin build, thin face, and 'sneaky' eyes") appeared, "stuck a gun in his face," and forbade him to enter. Early on January 10, 1976, a fire occurred at 62 Brunswick Street. Later that day Abercrombie saw in the office of the

building managers a man whom he believed to be the man who had confronted him with a gun on the previous evening.

On July 10, 1979, Abercrombie at the request of Trooper Flaherty looked at an array of fifty photographs and selected two. Neither was a picture of Benson. On August 3, 1979, Trooper Flaherty saw Benson and four others enter 105 State Street, where Benson and his brother were doing renovations. Abercrombie had met Trooper Flaherty at a building across the street and, at the trooper's request, entered 105 State Street to see if he could find there the man who had confronted him with a gun on January 9, 1976. Among seven or eight people seen by him there, Abercrombie talked with one man who, so Abercrombie thought, was the man who had held the gun, although his hair was thinner in front than he recalled. Abercrombie, not sure, wanted to see the man again. On March 3, 1980, Trooper Flaherty knew that Benson and his brother were to be at a trial in the Superior Court in Boston. Abercrombie (accompanied by an investigator from the Attorney General's office) did not recognize any person in the hallway outside of one courtroom or in that courtroom. They then went to the hallway outside another court session, where they observed seven people. After fifteen minutes, about twenty people (including four or five over six feet tall) emerged. In one group was Albert Benson. Abercrombie had a good opportunity to observe him as he entered the hallway and waited for the elevator. Abercrombie told the investigator that Benson was "the guy." The judge explicitly found that "no one suggested that . . . [Abercrombie] identify . . . Benson" and that Abercrombie believed he was identifying the man who had confronted him with a gun in 1976. The judge concluded that neither the incident in August, 1979, at 105 State Street, nor that in March, 1980, at the courthouse, was "impermissibly suggestive" and that each was the "equivalent of a line-up."

3. As to both Holland and Abercrombie, the motion judge found that all the photographic arrays and confrontations were "fair and not corrupted by suggestion of the prosecution team" and discredited "other conflicting testimony." He decided that Benson had failed to sustain his burden of proof that either witness "was subjected by the prosecution . . . to a procedure . . . so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny . . . [Benson] due process of law." He gave weight to "the totality of the circumstances" of the procedures adopted. See *Commonwealth* v. *Jones*, 9 Mass. App. Ct. 83, 88 (1980), and cases there cited.

The motion judge, who saw and heard the identifying witnesses, was justified on all the evidence before him in his subsidiary findings and in his determination that no unnecessarily suggestive procedure (which preceded the indictments of March 13, 1980) had been used. Where the evidence was conflicting, he reasonably could accept that account which he believed. Because the identification procedures were not imper-

missibly suggestive, there was no occasion to determine whether the witnesses' testimony need be suppressed as unreliable. The testimony was, as the motion judge ruled, "all for the jury to weigh and not for" him to appraise. See *Commonwealth* v. *Chase,* 372 Mass. 736, 740-746 (1977); *Commonwealth* v. *Jones,* 375 Mass. 349, 352-359 (1978); *Commonwealth* v. *Fitzgerald,* 376 Mass. 402, 405-411 (1978); *Commonwealth* v. *Storey,* 378 Mass. 312, 316-319 (1979), cert. denied, 446 U.S. 955 (1980); *Commonwealth* v. *Cincotta,* 379 Mass. 391, 393-397 (1979). See also *Commonwealth* v. *Correia,* 381 Mass. 65, 79-80 (1980); *Commonwealth* v. *Dyer,* 389 Mass. 677, 684-685 (1983); *Commonwealth* v. *Mattias,* 8 Mass. App. Ct. 786, 788-789 (1979); *Commonwealth* v. *Coy,* 10 Mass. App. Ct. 367, 370-372 (1980); *Commonwealth* v. *Smith,* 12 Mass. App. Ct. 667, 673-675 (1981); *Commonwealth* v. *Walker,* 14 Mass. App. Ct. 544, 550-551 (1982). Compare *Commonwealth* v. *Moon,* 380 Mass. 751, 756-759 (1980); *Commonwealth* v. *Worlds,* 9 Mass. App. Ct. 162, 168-169 (1980); *Commonwealth* v. *Marks,* 12 Mass. App. Ct. 511, 514-516 (1981).

4. Abercrombie's in-person observations of Benson at 105 State Street and in the courthouse were procedurally much closer to usual line-up practice than the one-on-one identification approved in *Commonwealth* v. *Storey,* 378 Mass. at 316-319. The procedure here used is sharply distinguishable from the attempted identification in front of the Lowell courthouse, conceded to have been suggestive, in *Commonwealth* v. *Botelho,* 369 Mass. 860, 863-865 (1976).

5. An unusual amount of time elapsed between the fires in January, 1976, and early March and July, 1979, when these witnesses first were asked to look at photographic arrays. We recognize that the 1976 observations by each witness of persons then seen around the two Brunswick Street buildings were somewhat limited in time. As the experienced trial judge (who heard much the same testimony as was presented to the motion judge) said when imposing sentence, the case is "close" and the identification testimony was not the "most unshakeable . . . to be put before a jury." Benson had not shown, however, that the testimony was tainted by any prosecution impropriety. Thus, it appropriately was submitted to the jury.

*Judgment affirmed.*

*John C. Martland* for the defendant.

*Carlo A. Obligato,* Assistant Attorney General, for the Commonwealth.