COMMONWEALTH *vs.* DAVID SCOTT HOWARD.

No. 97-P-1639.

Worcester. November 12, 1998. - February 22, 1999.

Present: JACOBS, PORADA, & RAPOZA, JJ.

*Practice, Criminal,* Examination of jurors, Judicial discretion, Agreement between prosecutor and witness. *Jury and Jurors. Identification. Evidence,* Cross-examination, Bias.

At the trial of a criminal case, the judge acted properly within his discretion, in response to a note from the jury expressing concern about the confidentiality of juror questionnaires, in carefully explaining to the jury panel how the questionnaires were used in the jury selection process and in questioning the jurors individually to determine whether any juror was biased against the defendant. [367-369]

At the trial of indictments, the judge did not err in admitting in evidence without a precautionary instruction an unredacted plea agreement the Commonwealth made with a cooperating witness, which contained nothing irrelevant and which was not contingent on any particular testimony. [369]

At a criminal trial, testimony of an identifying witness regarding a distinctive "bobbing" walk of the defendant and the man leaving the crime scene was admissible for the jury's consideration. [369]

At the trial of indictments, there was no error in the judge's refusing to allow cross-examination of the Commonwealth's cooperating witness about the acquittal on similar charges of a codefendant, where that evidence would not have been probative of the defendant's guilt and where the witness's bias was more than adequately explored. [369-370]

INDICTMENTS found and returned in the Superior Court Department on January 13, 1995.

The cases were tried before *Daniel F. Toomey,* J.

*James H. Budreau* for the defendant.

*Anne S. Manzello,* Assistant District Attorney, for the Commonwealth.

JACOBS, J. After a trial in the Superior Court, the defendant was found not guilty of murder and convicted of armed robbery, armed assault in a dwelling, and unlicenced possession of a

firearm. The defendant claims the judge erred in his reaction to a note from the jury and in making certain evidentiary rulings. We affirm.

1. *Jury note.* On the sixth day of trial, a Monday, the judge received a note typed by the foreman of the jury over the previous weekend, which stated:

> "Some jurors have expressed concern that during the jury selection process the defendant had access to the confidential juror questionnaire which lists telephone numbers, home and business addresses. The potential for retaliation and/or harassment has become an issue which needs to be addressed."

Defense counsel moved for a mistrial or, alternatively, that an inquiry be made of the jurors, claiming they were fearful and no longer impartial. After denying the motion for mistrial, the judge, with the express agreement of counsel and the defendant, closed the courtroom and described to the jury the reasons for certain information being required of them on questionnaires and how the questionnaires are used during the empanelment process.[1] With counsel and the defendant still present, he then questioned each juror individually and out of the hearing of the other jurors. When called, the jurors were identified by number and seat position. The judge asked whether the juror had heard his explanation about the use of the confidential questionnaires, whether the juror had any questions about that procedure, and whether the juror could be fair and impartial in assessing the evidence presented. The answers of the jurors to these questions all were unambiguously affirmative, except for one juror who stated, "I think so. I hope so." The judge then asked that juror whether she had any doubt and if there was some other reason why she could not be fair and impartial. Both questions received unequivocal "no" answers. The foreman also was asked additional questions about his preparation of the note and responded that "four or five" jurors had expressed concern, "and there was one that was adamant about it." Those individuals were not identified and the judge did not pursue the matter further. The jurors then were permitted to resume their duties. They returned their verdicts following two more days of trial.

The defendant faults the procedure used by the judge claim-

[1] We reproduce the judge's explanation in the Appendix, *infra.*

ing that it reinforced the jurors' fear by implying that the procedure was taken to reduce any risk to them. He also argues the judge did not go far enough to determine who the "four or five" concerned jurors were, and the precise extent and degree of bias toward the defendant.

"Determination of potential juror prejudice is a matter within the sound discretion of the trial judge." *Commonwealth* v. *Samuel*, 398 Mass. 93, 96 (1986), and cases cited. In circumstances similar to those we confront, this court in *Commonwealth* v. *Perez*, 44 Mass. App. Ct. 911 (1998), found no error where the judge, when presented with a question about the use of questionnaires and the possibility of "retribution by a disappointed party," which a juror had discussed with the other jurors, explained how the questionnaires are used in empaneling the jury, then interviewed each juror to determine whether "each . . . was certain that he or she could sit on the case with an open mind." *Ibid.* Contrary to the defendant's assertion, the judge's careful explanation in this case of the typical use of questionnaires in the jury selection process, reasonably assessed, would not convey to jurors that anything particular had been done to avoid their identification to the defendant.[2] See Appendix, *infra.* The judge emphasized that he was presenting a generalized view of the process in criminal trials, and noted the "minimal" opportunity for a defendant to fix in mind identifying information on jurors. By inquiring of the jurors individually, he avoided any potential reluctance of a juror to give answers which could be heard by other jurors. See *Com-*

---

[2]The defendant claims his right to a presumption of innocence was violated, and the jury were prejudiced against him when the judge permitted them to be called by number rather than name, likening this procedure to the empaneling of an anonymous jury in *Commonwealth* v. *Angiulo*, 415 Mass. 502 (1993). In that case the jurors were selected using questionnaires identifying them alphanumerically, where their names, addresses, and places of employment were concealed. *Id.* at 521 & n.14. In the present case, none of that information had been concealed. When the jurors were called for individual questioning, they were identified by their panel and seat numbers, rather than by name. The use of numbers was consistent with the previous empanelment procedure, although names also were used in two stages of that process. "The presumption of innocence . . . is a basic component of a fair trial under our system of criminal justice." *Estelle* v. *Williams*, 425 U.S. 501, 503 (1976). In the circumstances, nothing about the method of identifying jurors for individual questioning appears to rise to the level of a practice or procedure affecting the jurors' perception of the defendant which may undermine the presumption of innocence. Contrast *Commonwealth* v. *Angiulo, supra* at 527.

*monwealth* v. *Flebotte*, 417 Mass. 348, 355-356 (1994). In light of the judge's unique position from which to evaluate the individual responses of the jurors to his questions, it lay within his discretion not to inquire further of any juror or seek identifying information from the foreman. See *Commonwealth* v. *Tavares*, 385 Mass. 140, 156, cert. denied, 457 U.S. 1137 (1982).

In the circumstances, the procedure followed by the judge not only was within his discretion but also was a proper and adequate way of determining whether any juror was biased against the defendant or harbored any concern which would affect his or her impartiality. Cf. *Commonwealth* v. *Jackson*, 376 Mass. 790, 800-801 (1978); *Commonwealth* v. *Samuel*, 398 Mass. at 96. In the absence of affirmative contrary evidence, it does not strike us that the judge's method was less effective than first determining who the "four or five" jurors were who had expressed concern. Compare *Commonwealth* v. *Perez*, 44 Mass. App. Ct. at 911. Cf. *Commonwealth* v. *Ferguson*, 425 Mass. 349, 353-354 (1997). There was no error.

2. *Other issues.* The judge did not err in admitting the Commonwealth's unredacted plea agreement with a cooperating witness. It contained no irrelevant provisions and was not contingent on any particular testimony. No emphasis was placed on the "truthful cooperation" obligation of the witness, and the Commonwealth did not improperly vouch for his credibility or indicate it could determine the truthfulness of the testimony. In the circumstances, the judge was not required to give the cautionary instructions requested by the defendant. *Commonwealth* v. *Daye*, 411 Mass. 719, 740 (1992). Compare *Commonwealth* v. *Grenier*, 415 Mass. 680, 686-687 (1993). Contrast *Commonwealth* v. *Ciampa*, 406 Mass. 257, 262-263 (1989).

Contrary to the defendant's claim, the testimony of a witness that she briefly saw the defendant on a television news clip exhibiting a similar "bobbing" walk to that of the man she saw leaving the crime scene was admissible. Compare *Commonwealth* v. *Warren*, 403 Mass. 137, 139 (1988). The reliability of that identifying evidence was for the jury to determine. See *Commonwealth* v. *Benson*, 17 Mass. App. Ct. 936, 938-939 (1983).

The defendant argues the judge erred by denying cross-examination of the Commonwealth's cooperating witness about the acquittal of another codefendant on similar charges arising

out of the same episode for the purpose of showing bias or prejudice. There was no error, as the witness's bias was more than adequately explored through other questioning. See *Commonwealth* v. *Walker*, 370 Mass. 548, 572, cert. denied, 429 U.S. 943 (1976); *Commonwealth* v. *Borans*, 379 Mass. 117, 150-151 (1979). Moreover, "evidence of the acquittal of a person jointly charged but separately tried is not probative of the innocence of the others charged." *Commonwealth* v. *Haraldstad*, 16 Mass. App. Ct. 565, 571 (1983).

*Judgments affirmed.*

APPENDIX.

"Let me advise you generally that in every case on the criminal side of the court, whether it is a shoplifting, a rape, a murder, larceny, carjacking, whatever the case may be, every defendant has a right to know who sits in judgment of him or her. Our statutes make that very, very clear that the defendants have a right to know who are the people who are sitting in judgment over the particular defendant.

"In order to assist defendants and the Commonwealth in intelligently exercising various challenges, you remember we went through that impanelment process which must have seemed like forever for you folks, in order [that] both sides and the court may be assured of the qualifications of the potential jurors, we have jurors fill out that confidential juror questionnaire to which you have alluded in your note, Mr. Foreperson. That questionnaire is employed solely during the impanelment process. And I think you undoubtedly observed the fact that both attorneys had a batch of those questionnaires and they went through them one at a time as particular jurors were called, including yourselves.

"After that particular process is over, the questionnaire is delivered to the clerk. The clerk keeps the questionnaires in a sealed envelope and they are kept for 30 days after the conclusion of the trial, at which point they are shredded. They are not open to the public. No one gets to see them at all.

"As you undoubtedly observed, the defendant, who has a right to know who is sitting in judgment of him, has an opportunity when he is sitting at counsel table, to look at those questionnaires and assist his counsel in determining when challenges should be used, when they should not be used, and when there is question of qualifications at all. That opportunity, of course, is quite minimal in terms of any defendant, and I am not directing my attention to this particular defendant at all, I'm giving you a generalized view of how the process works. It is a very minimal opportunity for any defendant to be able to record in his or her mind the addresses and telephone numbers and other identifying data of the particular person who is called to sit as a juror or called to be examined with respect to the qualifications to be a juror.

"The other point that I would mention to you is that the attorneys, both attorneys, are officers of the court and they have certain responsibilities, and

there is no indication that there is any likelihood or possibility of an inappropriate distribution of whatever notes they happen to take with respect to the impanelment process, if any.

"I'm offering you these comments not to suggest that there is any reason to be concerned by the fact that the clerk takes these particular questionnaires as he or she does in each and every case, and they are ultimately destroyed. That's just part of the process. And I'm telling you not to suggest that this case is any different from any other case. I'm merely telling you this so that you will have information with respect to how the process works, and it will be the sort of thing which you will take into account when I ask you certain questions next, as I am going to do."